79 N.Y.2d 333 (1992)
New York State School Boards Association, Appellant,
v.
Thomas Sobol, as New York State Commissioner of Education, et al., Respondents.
Court of Appeals of the State of New York.
Argued February 19, 1992.
Decided March 31, 1992.
Jay Worona and Pilar Sokol for appellant.
Elizabeth R. Koepcke, Lizette A. Cantres and Roberts Abrams, Attorney-General (Daniel Smirlock of counsel), for respondents.
Stanley Geller for Committee for Public Education and Religious Liberty, amicus curiae.
Deborah Goldberg, Donna Lieberman, Arthur N. Eisenberg, Laurie R. Rockett, William B. Rubenstein, of the Pennsylvania and District of Columbia Bars, admitted pro hac vice, Ruth E. Harlow and Janet Benshoof for New York Civil Liberties Union and others, amici curiae.
Chief Judge WACHTLER and Judges SIMONS, KAYE and HANCOCK, JR., concur with Judge BELLACOSA; Judge TITONE dissents and votes to reverse in a separate opinion in which Judge ALEXANDER concurs.
*335 BELLACOSA, J.
Plaintiff New York State School Boards Association (Association) appeals as of right on Establishment Clause constitutional grounds (US Const 1st Amend). The Appellate Division order upheld the State Education Department regulations which mandate the inclusion of "representatives from religious organizations" on advisory councils in public school development of education and instruction programs to combat the epidemic of Acquired Immune Deficiency Syndrome (AIDS). The key sentence and challenged clause of the regulations directs: "The advisory council shall consist of parents, school board members, appropriate school personnel, and community representatives, including representatives from religious organizations" (8 NYCRR 135.3 [b] [2]; [c] [2] [emphasis added]). We agree with the two courts below that the regulations, as facially challenged, meet the guidelines established by the United States Supreme Court in Lemon v Kurtzman (403 US 602) *336 and do not violate the Establishment Clause. We therefore affirm.
In 1977, the Legislature authorized respondent, State Commissioner of Education (Commissioner), to "prescribe in regulations such health education courses * * * as * * * may [be] deem[ed] necessary and desirable for the welfare of pupils and the community" (Education Law § 804 [4]). In 1987, the Commissioner promulgated regulations (eff Jan. 6, 1988) requiring all elementary and secondary schools to provide AIDS instruction to schoolchildren (8 NYCRR 135.3 [b] [2]; [c] [2]). The instruction is to be "age appropriate and consistent with community values" (id.). The regulations express mandated goals: to "provide accurate information to pupils concerning the nature of the disease, methods of transmission, and methods of prevention" (id.). The instruction must "stress abstinence as the most appropriate and effective premarital protection against AIDS" (id.). Students, with parental permission, may "opt out" of the school instruction, provided assurance is given that they will receive instruction at home. The local boards of education or trustees are responsible for formulating the content of the instruction and approving and evaluating its implementation. In public schools, the boards and trustees are required to establish advisory councils to make recommendations regarding the content, implementation and evaluation of the instruction. The mandated composition of the advisory councils reflects a desire for broad and early community input, coupled with the objective of avoiding student "opt outs" from the ultimately adopted education program, thus reaching the greatest number of pupils with accurate, effective information.
The Association sues for declaratory judgment that the regulations violate the Establishment Clause of the First Amendment of the United States Constitution (US Const 1st Amend). It urges facial unconstitutionality of the regulations, and does not advance, develop or urge an "as applied" unconstitutionality argument. The record is barren of any evidence describing the manner in which the regulations are being implemented in the myriad of school districts throughout the State.
Supreme Court, Albany County, applying the still-governing tripartite test of Lemon v Kurtzman (403 US 602, supra; see, Matter of Klein [Hartnett], 78 N.Y.2d 662, 666), granted the Commissioner's cross motion for summary judgment. The Appellate Division technically modified, agreeing substantively *337 with Supreme Court that the regulations passed facial constitutional muster (168 AD2d 188). Those courts concluded that the regulations properly reflect that "representatives from religious organizations" have some role to contribute in addressing the AIDS epidemic, and that the challenged portion of the regulations has only an incidental and remote, not primary, effect on the advancement of religion. Those courts emphasized the advisory nature of the councils in rejecting the Association's argument that the regulations created a symbolic link between religion and State, and rebuffed the Association's excessive entanglement theory as speculative.
The Establishment Clause of the First Amendment states that "Congress shall make no law respecting an establishment of religion" (US Const 1st Amend). These first words of the Bill of Rights, ratified just over 200 years ago, have deep roots in this Nation's history of religious freedom, diversity and tolerance. The evolution of the Establishment Clause has been traced fully in several United States Supreme Court decisions (see, Engel v Vitale, 370 US 421, 425-430; Everson v Board of Educ., 330 US 1, 8-14; see also, Edwards v Aguillard, 482 US 578, 605 [Powell, J., concurring]; Wallace v Jaffree, 472 US 38, 93-106 [Rehnquist, J., dissenting]). Everson v Board of Educ. (supra) summarizes the "essential precepts" of the Establishment Clause, which applies to the States under the Fourteenth Amendment, as follows:
"The `establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence * * * person[s] to go to or remain away from church against [their] will or force [them] to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa." (330 US 1, 15-16, supra.)
*338 The Establishment Clause, then, has emerged as "more than a pledge that no single religion will be designated as a state religion * * * [or] a mere injunction that governmental programs discriminating among religions are unconstitutional. * * * [I]nstead, [it] primarily proscribes `sponsorship, financial support, and active involvement of the sovereign in religious activity.'" (Grand Rapids School Dist. v Ball, 473 US 373, 381.)
In recent years, the United States Supreme Court has recognized that total separation between government and any governmental acknowledgment of the role of religion in citizens' lives is not possible or desirable, and would in fact exhibit hostility rather than a constitutionally correct neutrality towards religion (see, Lynch v Donnelly, 465 US 668, 672-673; Lemon v Kurtzman, 403 US 602, 614, supra; see also, Allegheny County v Greater Pittsburgh Am. Civ. Liberties Union, 492 US 573, 623 [O'Connor, J., concurring]; Aguilar v Felton, 473 US 402, 420 [Burger, Ch. J., dissenting]). Thus, in general, and especially on a facial challenge, so long as the government "maintain[s] a course of neutrality among religions, and between religion and nonreligion" (Grand Rapids School Dist. v Ball, 473 US 373, 382, supra), its actions will withstand Establishment Clause scrutiny.
Drawing on these general principles and the "cumulative criteria developed by the Court over many years," the United States Supreme Court in Lemon v Kurtzman (403 US 602, 612, supra) prescribed its tripartite "test" for evaluating the constitutionality of governmental actions under the Establishment Clause: first, the action must have a secular purpose; second, it must not have a principal or primary effect that advances or inhibits religion; third, it must not foster excessive governmental entanglement with religion (id., at 612-613). Although characterized as a "test", the United States Supreme Court has cautioned that the Lemon criteria "`must not be viewed as setting the precise limits to the necessary constitutional inquiry, but serve only as guidelines'" or "`helpful signpost[s].'" (Grand Rapids School Dist. v Ball, 473 US 373, 383, supra, quoting Meek v Pittenger, 421 US 349, 359; Lynch v Donnelly, 465 US 668, 679, supra; Mueller v Allen, 463 US 388, 394, quoting Hunt v McNair, 413 US 734, 741). Indeed, individual Justices of the United States Supreme Court have expressed varying viewpoints on the continued utility and vitality of the Lemon test (see, Allegheny County v Greater Pittsburgh Am. Civ. Liberties Union, 492 US 573, 625, supra *339 [O'Connor, J. concurring]; Edwards v Aguillard, 482 US 578, 636-640, supra [Scalia, J., dissenting]; Aguilar v Felton, 473 US 402, 419, supra [Burger, Ch. J., dissenting]; Wallace v Jaffree, 472 US 38, 68-69 [O'Connor, J., concurring], and 113 [Rehnquist, J., dissenting], supra; Lynch v Donnelly, 465 US 668, 687-689, supra [O'Connor, J., concurring]; see also, Lee v Weisman, 505 US ___, 112 S Ct 2649). Nevertheless, we are unanimous that the Lemon analysis persists as the governing precedent and guide in this area (see, Bowen v Kendrick, 487 US 589, 602, quoting Mueller v Allen, 463 US 388, 394, supra; Matter of Klein [Hartnett], 78 N.Y.2d 662, 666, supra).
The United States Supreme Court has "particularly relied on Lemon in every case involving the sensitive relationship between government and religion in the education of our children", a point strongly emphasized by appellant Association (Grand Rapids School Dist. v Ball, 473 US 373, 383, supra; see, Edwards v Aguillard, 482 US 578, 584, supra). In this context, we proceed to examine and apply the Lemon test to the challenged portion of the regulations.
The Association concedes that the regulations have a secular purpose. Indeed, it is facially evident that the compelling purpose of the regulations is to acquire broad and early community input and then to disseminate accurate information about the AIDS epidemic to as many schoolchildren as possible.
The focus of appellant's sharpest and strongest attack is on the failure of the regulations to overcome the second prong of the Lemon test  that the principal or primary effect must not advance religion. A particular concern under the "effects" prong is "whether the symbolic union of church and state effected by the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices" (Grand Rapids School Dist. v Ball, 473 US 373, 390, supra; see, Allegheny County v Greater Pittsburgh Am. Civ. Liberties Union, 492 US 573, 595-597, supra). Context determines whether particular governmental action is likely to be perceived as an endorsement of religion (see, Allegheny County v Greater Pittsburgh Am. Civ. Liberties Union, supra, at 595-597). Governmental action "endorses" religion if it favors, prefers, or promotes it (see, Edwards v Aguillard, 482 US 578, 593, supra; Wallace v Jaffree, 472 US 38, 59-60, supra; *340 Lynch v Donnelly, 465 US 668, 691, supra). The regulations do not have any of those forbidden effects, despite the conclusory and speculative assertions in the dissenting opinion.
The Association specifically urges that the regulations unconstitutionally advance religion because they mandate representation on the public school advisory councils from among members of religious organizations while failing to list other community groups, and therefore make adherence to religion a relevant qualification to representation on the councils. The Association argues that this conveys a message of endorsement of religion and thus creates the forbidden "symbolic link" between church and State. The argument with respect to this prong does not survive analysis.
The "endorsement test" does not "preclude government from acknowledging religion or from taking religion into account in making law and policy" (Wallace v Jaffree, 472 US 38, 70, supra [O'Connor, J., concurring]; see also, Allegheny County v Greater Pittsburgh Am. Civ. Liberties Union, 492 US 573, 625, supra [O'Connor, J., concurring]). In the context of the extremely sensitive, complex, and escalating threat which society faces from AIDS  unless the broadest audience is reached as early as possible with the most accurate education program possible  it is particularly sensible for government to add the views of religious representatives on an advisory level to the predominant views it will receive from the rest of the community (see, Bowen v Kendrick, 487 US 589, 607, supra). Indeed, by including and considering the views of members of the community who are affiliated with religious organizations, the Commissioner insures that the AIDS instruction that is eventually adopted will more likely enjoy greater societal consensus and, therefore, greater secular effectiveness. By thus neutralizing or reducing possible objections from parents and subsequent opt-outs by schoolchildren, a more universal education program is likely to result (see, Ware v Valley Stream High School Dist., 75 N.Y.2d 114 [involving a religious group's claim under the Free Exercise Clause to exemption from the regulations requiring AIDS instruction in schools]). Thus, the principal, primary effect of the challenged portion of the regulations is to advance rational, legitimate, educational and secular goals, not to favor or prefer religious ones.
An important component in the analysis of the "effects" prong, which the dissenting opinion summarily dismisses (dissenting *341 opn, at 346-347), is that the councils serve in a purely advisory role to the trustees and the boards of education, which retain the unfettered and nondelegable public responsibility and discretion to adopt or reject any advisory views in whole or in part. This feature confirms the secondary, incidental nature and effects of that aspect of the regulations which mandates that advisory council membership include persons from religious organizations (see, Bowen v Kendrick, 487 US 589, 607, 612-613, supra; Lynch v Donnelly, 465 US 668, 683, supra). In this context, we conclude that it is not sufficiently likely that religious adherents or nonadherents would perceive from the inclusion of representatives from religious organizations on AIDS advisory councils that the State is endorsing or disavowing religion or nonbelievers. The second prong is not violated by these regulations in this respect.
The Association further argues that inclusion of community representatives from religious organizations is likely to be perceived as an endorsement of religion because the regulations fail to list other community groups as mandatory participants on advisory councils. The dissenting opinion mistakenly concludes that the regulations mandate the inclusion of "religious leaders" and claims that such persons are given "favored status" and "greater participatory privileges" than other community representative participants on the councils (dissenting opn, at 345, 346, 348, 349). This is characterized as "preferential", "automatic access to the governmental decision-making" (dissenting opn, at 346, 347). The assertion that representatives from religious organizations are invested with a greater role than other included individuals or "community representatives" is mistaken. No hierarchy or preferential weight is established or ascribed in the regulations, and none can be inferred on this facial analysis. The mandatory list of participants on the councils includes "parents, school board members, appropriate school personnel, and community representatives, including representatives from religious organizations." There is no fixed over-all number of representatives or proportionate allocation or distribution among the categories. By requiring a cross-section of community persons and entities to contribute to the development of the AIDS instruction, without restriction or further specification, the regulations reach out to the broadest possible network of input and viewpoints. We conclude that the challenged composition of advisory councils is not sufficiently likely to give rise to a perception that the government has favored or preferred *342 religious over nonreligious groups. The Commissioner instead has "successful[ly] maint[ained] * * * `a course of neutrality among religions, and between religion and nonreligion'" on the face of the promulgated regulations (Bowen v Kendrick, 487 US 589, 607, quoting Grand Rapids School Dist. v Ball, 473 US 373, 382, supra).
The Association additionally challenges the regulations as unconstitutional under the third prong of the Lemon test, arguing that they foster an excessive entanglement with religion. To evaluate this prong, courts must examine "the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority" (Lemon v Kurtzman, 403 US 602, 615, supra). The test is "inescapably one of degree" (Walz v Tax Commn., 397 US 664, 674), because some degree of entanglement between government and religion is inevitable given the complexity of modern society (see, Larkin v Grendel's Den, 459 US 116, 123; Lemon v Kurtzman, 403 US 602, 614, supra). The "excessive entanglement" concept has its genesis in a tax-exemption case (Walz v Tax Commn., supra). It has primarily been implicated in cases involving public financial aid to parochial schools, with the concomitant need for administrative interaction and ongoing supervision and monitoring to ensure the absence of a religious message (see, Aguilar v Felton, 473 US 402, supra; Lemon v Kurtzman, 403 US 602, supra; see also, Bowen v Kendrick, 487 US 589, supra). It has also been implicated in cases in which discretionary governmental powers are delegated to or shared with religious institutions (see, Larkin v Grendel's Den, 459 US 116, 127, supra).
Obviously, the ongoing monitoring and supervision required in connection with the administration of financial aid regulations is not implicated here, and religious institutions are not exercising any discretionary governmental functions in this case.
The Association nevertheless argues that "excessive entanglement" will result when boards of education or trustees face the task of sifting through the recommendations of the advisory councils to screen out those that may represent religious dogma or tenets which could impermissibly advance religion. We agree with the Appellate Division that this argument is entirely speculative. The recommendations that may emerge from advisory councils  not necessarily from the individuals *343 who constitute the councils  may not include religious viewpoints as such or at all. The supposed sifting methodology is not necessary or inherent to the consideration and analysis of advisory council recommendations by the boards and trustees under the facially challenged regulations. Indeed, given the almost certainly dominant secular membership of the councils, any religious input is not likely to rise to anything approaching the required "excessive" entanglement level.
The Association alternatively argues, and the dissenting opinion seems to agree (dissenting opn, at 348), that there will be a need to choose representatives from among many religious organizations active in a community, and that this will lead to political divisiveness and excessively entangle school boards in matters of different religions. This argument, too, has a speculative "as applied" analytical flavor and has no merit or record support.
In sum, the Association's facial constitutional challenge to the mandated inclusion of representatives from religious organizations in public school AIDS education advisory councils fails under all the Lemon prongs.
Accordingly, the order of the Appellate Division should be affirmed, with costs.
TITONE, J. (dissenting).
In recognition that education is the only meaningful weapon society currently has to combat the spread of AIDS, the Commissioner of the State Education Department has promulgated regulations requiring all elementary and secondary schools within the State to develop courses of "appropriate instruction" on that subject as part of their health education programs (8 NYCRR 135.3 [b] [2]; [c] [2]). We have no quarrel with the Commissioner's goal of instituting a program of mandatory AIDS education, nor do we question the Commissioner's decision to implement that goal by requiring the establishment of community-based advisory councils to make "recommendations concerning the content [and] implementation" of the AIDS curriculum (id.). We do find it objectionable, however, that the Commissioner has seen fit to require the presence of "representatives from religious organizations" on these advisory committees (see, id.). In our view, this requirement has the inevitable and primary effect of both favoring and endorsing religion and, as such, violates a "core purpose of the Establishment Clause" (Grand Rapids School Dist. v Ball, 473 US 373, 389). Accordingly, we dissent.
*344 Initially, we do not dispute that the tripartite Lemon test (Lemon v Kurtzman, 403 US 602) is the controlling standard for measuring the constitutional validity of the regulations challenged here. Nor do we find fault with the majority's general discussion of the essential precepts of the Establishment Clause, including its acknowledgment that the Clause proscribes not only discrimination against some denominations but also discrimination in favor of religion in general (majority opn, at 338, citing Grand Rapids School Dist. v Ball, supra). Our quarrel with the majority lies, instead, with its application of these broad principles to the particular problem raised by the challenged regulations.
Since plaintiff does not argue that the regulations have a secular purpose, we will not here pursue that aspect of the tripartite Lemon analysis. Indeed, we find little reason to explore the degree to which the religious-representative requirements of 8 NYCRR 135.3 (b) (2) and (c) (2) have a goal that is sufficiently secular to pass muster under Lemon, since, contrary to the majority's holding, we conclude that the regulations' effect is one that is unacceptable under the second prong of the Lemon inquiry.
It is by now axiomatic that to avoid objection under the Establishment Clause a statute must have a "`principal or primary effect * * * that neither advances nor inhibits religion'" (Mueller v Allen, 463 US 388, 394). It is also axiomatic that government may not adopt measures which have the effect of endorsing religion, even symbolically (Grand Rapids School Dist. v Ball, supra, at 389-390). The government must "maintain a course of neutrality among religions and between religion and nonreligion" (id., at 382). Finally, the area of government educational programs for children is one where special caution is warranted because children are highly impressionable and the symbolism of a union between church and State is likely to have a magnified impact (id., at 383, 390). When viewed in light of these principles, the challenged regulations cannot be regarded as anything other than a patent violation of the Establishment Clause.
Initially, the majority's conclusion that the regulations do not have the "primary effect" of advancing religion appears to be based in large measure on the indisputable premise that the regulations serve a useful secular purpose (see, majority opn, at 340). In this respect, its analysis is simply incomplete, since Lemon v Kurtzman (supra) and its progeny require a *345 showing of both a legitimate secular purpose and a "primary effect" that neither advances nor inhibits religion.
Furthermore, the majority's analysis is constricted by an overly narrow view of the problem the challenged regulations present. The central focus of the majority's opinion seems to be the degree to which the religious views of the advisory committees' religious representatives are likely to have a concrete impact on the AIDS curriculum. Indeed, the entire tenor of the majority's opinion suggests that it views the problem presented here solely as one involving a potential religious interference with school curriculum decisions (see, e.g., Epperson v Arkansas, 393 US 97; Engel v Vitale, 370 US 421). Of course, if that were the only problem, the majority's conclusion would be unobjectionable, since, as the majority states, it cannot be assumed that the religious views of the mandatorily designated committee members will necessarily find their way into the AIDS curriculum. However, as will be demonstrated below, that is only one minor aspect of the "effect" that these disputed regulations will have.
By requiring that all AIDS education advisory committees include representatives of religious organizations, the State is declaring, in the most direct terms, that, above all other interested groups in society, religion has a unique and indispensable role to play on the councils of government (cf., Bowen v Kendrick, 487 US 589, 605 [challenged legislation does not suggest "that religious institutions * * * are uniquely well qualified to carry out (funded) services"]). The unmistakable message is that the views of religious leaders enjoy a favored status and that relevant secular viewpoints, such as those of psychologists, social workers and business leaders are of substantially less significance.[1] The "endorsement" *346 of religion, as distinguished from "nonreligion," could not be clearer (see, Grand Rapids School Dist. v Ball, supra, at 382).
Furthermore, the effect of the challenged regulation goes beyond a merely symbolic endorsement of religion. By guaranteeing their leaders a seat on the schools' AIDS education advisory panels, the State has given religious adherents automatic access to the governmental decision-making  a benefit not conferred on any other group of citizens. As a consequence, religious adherents, through their representatives, are afforded greater participatory privileges, in direct violation of the fundamental neutrality principle. Indeed, the twin evils that Justice O'Connor identified in Lynch v Donnelly (465 US 668, 688 [O'Connor, J., concurring]) are directly implicated here. 8 NYCRR 135.3 (b) (2) and (c) (2) "give [religious] institutions access to government or governmental powers not fully shared by nonadherents" and, as a consequence, those regulations "foster the creation of political constituencies defined along religious lines"[2] (id., at 688).
Nor can it be said that the threat to the values implicit in the Establishment Clause is any less substantial because the role that religious leaders are granted is merely advisory (see, majority opn, at 340-341). Plainly, if a regulation directed all public school principals to consult with the parish priest or local rabbi before developing a history or science curriculum, few would dispute that the Establishment Clause had been violated. *347 Yet, that is precisely the import of the regulations at issue here.
While it is true, as the majority notes, that the Establishment Clause does not "preclude government from * * * taking religion into account" (Wallace v Jaffree, 472 US 38, 70), it certainly does not follow that government may give religion preferential access to its decision-makers' ears. Nor does it follow that the Establishment Clause permits government to confer such favored status on religion over other viewpoints whenever some secular goal, such as that identified by the majority (majority opn, at 340), is advanced.[3] Indeed, in its effort to find a "primary" secular effect to satisfy the second prong of the Lemon test, the majority has, ironically, itself adopted a position that the Establishment Clause forbids.
The majority argues that mandatory involvement of representatives of religious views is desirable and has a primarily secular effect because it will ensure that the resulting product will reflect "a greater societal consensus" and will thereby "neutraliz[e]" potential community opposition (majority opn, at 340). However, that is simply another way of saying that the regulations are valuable because they enable government to co-opt the views of the religious community by incorporating, or at least appearing to incorporate, them in its educational programs. Once again, even this purported "secular effect" that the majority has identified has as its true "primary" effect the endorsement of religion, in direct violation of the *348 Supreme Court's prohibition in Lemon v Kurtzman (supra, at 612-613) and Grand Rapids School Dist. v Ball (supra).
Moreover, by relying on the benefits that an alliance with religious leaders might have for government, the majority has fallen into one of the traps that are associated with governmental efforts to use religion to accomplish its own secular goals. As one commentator has noted, when the government uses religion, or religious leaders, as a tool, it is actually exploiting a "borrowed aura of * * * legitimacy," which, because of the "fundamental importance that religion holds for many people," may lend its policies an undeserved level of credibility (Tribe, American Constitutional Law § 14-15, at 1287 [2d ed]).
Yet another problem with the majority's proffered justification for upholding the regulations is its insensitivity to the feelings and opinions of those who are not religious adherents. The majority's assumption that a curriculum adopted after consultation with religious leaders will have "greater secular effectiveness" and will "neutraliz[e]" possible community opposition overlooks the fact that, in addition to religious adherents, the community includes individuals who not only do not adhere to a particular religious view but are also opposed to educational programs that, directly or indirectly, reflect the viewpoints of religious leaders. Thus, the majority's analysis itself accomplishes precisely what Justice O'Connor cautioned against in Lynch v Donnelly (supra, at 688)  "send[ing] a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community."
Finally, the majority has not explained how school districts attempting to implement the challenged regulations can avoid the other vice that often accompanies rules that give religion a preferred position, i.e., favoring one denomination over another. Since the number of positions on the advisory boards mandated by 8 NYCRR 135.3 (b) (2) and (c) (2) is finite, school authorities will have to make choices among the leaders of the various sects in their communities. Some religions will be singled out for the favored status of committee membership, while others will necessarily be excluded. As a consequence, the principle of denominational neutrality will inevitably be violated (see, Tribe, op. cit., at 1286).
In sum, the religious-representative requirement of the *349 Commissioner's AIDS education rules runs directly counter to the primary objective of the Establishment Clause. Individual religious leaders, like the leaders of other segments of the community, undoubtedly have important secular contributions to make to the development of a program of AIDS education. However, when government mandates the participation of religious leaders as a class, the message is clear that what the government is seeking is a specifically religious perspective. That message represents a forbidden endorsement of religion and is inimical to the First Amendment's goal of "prevent[ing], as far as possible, the intrusion of either [Church or State] into the precincts of the other" (Lemon v Kurtzman, supra, at 614). Accordingly, we dissent.
Order affirmed, with costs.
NOTES
[1] The majority takes us to task for referring occasionally to religious "leaders" rather than to religious "representatives"  the term used in the regulation (majority opn, at 341). The majority's point in this regard is, at best, enigmatic. Although it is true that the regulations do not mandate that religious "leaders" be selected for service on the committees, it seems unreasonable to think that individuals who are little known or are not recognized as "leaders" within their religious groups would be chosen as "representatives." Similarly, it would be naive to suppose that the selected "leaders" or "representatives" appointed to the committees will not at least be perceived as "representing," and therefore expressing, a religious viewpoint. Indeed, if the appointed representatives were not "leaders" in some sense and were not perceived as representing a uniquely religious perspective on the question of AIDS education, there would be no purpose to mandating the presence of "representatives from religious organizations" as a class. Certainly, the purpose the majority identifies, i.e., "neutralizing or reducing possible objections from parents and subsequent opt-outs," (majority opn, at 340) would not be served, since the achievement of that goal depends to a large extent on the public's perception that the religious viewpoint has been taken into account.
[2] The majority's assertion that religious representatives "are invested with [no] greater role than other included individuals" (majority opn, at 341) misses the point. Our concern here is not that the religious representatives have a greater voice on the committee vis-à-vis "other included individuals," but rather that religious adherents, unlike all other community members, have guaranteed representation on the committees. While it is true that there is no fixed number of positions on the AIDS advisory committees, it is also true that the number of possible committee seats is necessarily finite and that, consequently, not all of the interest groups in the community will be able to be accommodated. Thus, legitimate interest groups such as planned parenthood organizations, local drug treatment programs and child welfare advocates will have to compete for representation, while, by virtue of the challenged regulations, religious adherents are assured of at least one seat. It is in this sense that the regulations confer a preference on religious adherents as a class and, for that reason alone, they are objectionable.
[3] Although it has quoted from Bowen v Kendrick (487 US 589), the majority has wisely avoided adopting respondent's argument that that case is all but dispositive of the issues presented here. In fact, because the statute challenged in Bowen is so different from the statute challenged here, the Supreme Court's decision in Bowen is of little analytical import in this appeal. The statute at issue in Bowen, which authorized Federal funding for private organizations to provide "`services and research in the area of premarital adolescent sexual relations,'" required grant applicants to describe how they will "`involve religious and charitable organizations,'" as well as families and other community groups (487 US, at 593, 596). Thus, unlike in this case, the statute upheld in Bowen did not mandate that government agencies consult directly with religious representatives. Furthermore, as the Supreme Court pointedly observed, there was "no requirement * * * that grantees be affiliated with any religious denomination" and there was no "suggestion that religious institutions * * * are uniquely well qualified to carry out [the funded] services" (id., at 604-605). It is precisely those characteristics that distinguish the regulations challenged here from the statute at issue in Bowen. And, it is precisely those characteristics that render these regulations constitutionally infirm.