OPINION OF THE COURT
Bbllacosa, J.
Plaintiff New York State School Boards Association (Association) appeals as of right on Establishment Clause constitutional grounds (US Const 1st Amend). The Appellate Division order upheld the State Education Department regulations which mandate the inclusion of "representatives from religious organizations” on advisory councils in public school development of education and instruction programs to combat the epidemic of Acquired Immune Deficiency Syndrome (AIDS). The key sentence and challenged clause of the regulations directs: "The advisory council shall consist of parents, school board members, appropriate school personnel, and community representatives, including representatives from religious organizations” (8 NYCRR 135.3 [b] [2]; [c] [2] [emphasis added]). We agree with the two courts below that the regulations, as facially challenged, meet the guidelines established by the United States Supreme Court in Lemon v Kurtzman *336 (403 US 602) and do not violate the Establishment Clause. We therefore affirm.
In 1977, the Legislature authorized respondent, State Commissioner of Education (Commissioner), to "prescribe in regulations such health education courses * * * as * * * may [be] deem[ed] necessary and desirable for the welfare of pupils and the community” (Education Law § 804 [4]). In 1987, the Commissioner promulgated regulations (eff Jan. 6, 1988) requiring all elementary and secondary schools to provide AIDS instruction to schoolchildren (8 NYCRR 135.3 [b] [2]; [c] [2]). The instruction is to be "age appropriate and consistent with community values” (id.). The regulations express mandated goals: to "provide accurate information to pupils concerning the nature of the disease, methods of transmission, and methods of prevention” (id.). The instruction must "stress abstinence as the most appropriate and effective premarital protection against AIDS” (id.). Students, with parental permission, may "opt out” of the school instruction, provided assurance is given that they will receive instruction at home. The local boards of education or trustees are responsible for formulating the content of the instruction and approving and evaluating its implementation. In public schools, the boards and trustees are required to establish advisory councils to make recommendations regarding the content, implementation and evaluation of the instruction. The mandated composition of the advisory councils reflects a desire for broad and early community input, coupled with the objective of avoiding student "opt outs” from the ultimately adopted education program, thus reaching the greatest number of pupils with accurate, effective information.
The Association sues for declaratory judgment that the regulations violate the Establishment Clause of the First Amendment of the United States Constitution (US Const 1st Amend). It urges facial unconstitutionality of the regulations, and does not advance, develop or urge an "as applied” unconstitutionality argument. The record is barren of any evidence describing the manner in which the regulations are being implemented in the myriad of school districts throughout the State.
Supreme Court, Albany County, applying the still-governing tripartite test of Lemon v Kurtzman (403 US 602, supra; see, Matter of Klein [Hartnett], 78 NY2d 662, 666), granted the Commissioner’s cross motion for summary judgment. The Appellate Division technically modified, agreeing substan *337 tively with Supreme Court that the regulations passed facial constitutional muster (168 AD2d 188). Those courts concluded that the regulations properly reflect that "representatives from religious organizations” have some role to contribute in addressing the ADDS epidemic, and that the challenged portion of the regulations has only an incidental and remote, not primary, effect on the advancement of religion. Those courts emphasized the advisory nature of the councils in rejecting the Association’s argument that the regulations created a symbolic link between religion and State, and rebuffed the Association’s excessive entanglement theory as speculative.
The Establishment Clause of the First Amendment states that "Congress shall make no law respecting an establishment of religion” (US Const 1st Amend). These first words of the Bill of Rights, ratified just over 200 years ago, have deep roots in this Nation’s history of religious freedom, diversity and tolerance. The evolution of the Establishment Clause has been traced fully in several United States Supreme Court decisions (see, Engel v Vitale, 370 US 421, 425-430; Everson v Board of Educ., 330 US 1, 8-14; see also, Edwards v Aguillard, 482 US 578, 605 [Powell, J., concurring]; Wallace v Jaffree, 472 US 38, 93-106 [Rehnquist, J., dissenting]). Everson v Board of Educ. (supra) summarizes the "essential precepts” of the Establishment Clause, which applies to the States under the Fourteenth Amendment, as follows:
"The 'establishment of religion’ clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence * * * person[s] to go to or remain away from church against [their] will or force [them] to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or dis-beliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa.” (330 US 1,15-16, supra.)
*338 The Establishment Clause, then, has emerged as “more than a pledge that no single religion will be designated as a state religion * * * [or] a mere injunction that governmental programs discriminating among religions are unconstitutional. * * * [I]nstead, [it] primarily proscribes 'sponsorship, financial support, and active involvement of the sovereign in religious activity.’ ” (Grand Rapids School Dist. v Ball, 473 US 373, 381.)
In recent years, the United States Supreme Court has recognized that total separation between government and any governmental acknowledgment of the role of religion in citizens’ lives is not possible or desirable, and would in fact exhibit hostility rather than a constitutionally correct neutrality towards religion (see, Lynch v Donnelly, 465 US 668, 672-673; Lemon v Kurtzman, 403 US 602, 614, supra; see also, Allegheny County v Greater Pittsburgh Am. Civ. Liberties Union, 492 US 573, 623 [O’Connor, J., concurring]; Aguilar v Felton, 473 US 402, 420 [Burger, Ch. J., dissenting]). Thus, in general, and especially on a facial challenge, so long as the government "maintain[s] a course of neutrality among religions, and between religion and nonreligion” (Grand Rapids School Dist. v Ball, 473 US 373, 382, supra), its actions will withstand Establishment Clause scrutiny.
Drawing on these general principles and the “cumulative criteria developed by the Court over many years,” the United States Supreme Court in Lemon v Kurtzman (403 US 602, 612, supra) prescribed its tripartite "test” for evaluating the constitutionality of governmental actions under the Establishment Clause: first, the action must have a secular purpose; second, it must not have a principal or primary effect that advances or inhibits religion; third, it must not foster excessive governmental entanglement with religion (id., at 612-613). Although characterized as a “test”, the United States Supreme Court has cautioned that the Lemon criteria “ 'must not be viewed as setting the precise limits to the necessary constitutional inquiry, but serve only as guidelines’ ” or " 'helpful signpost[s].’ ” (Grand Rapids School Dist. v Ball, 473 US 373, 383, supra, quoting Meek v Pittenger, 421 US 349, 359; Lynch v Donnelly, 465 US 668, 679, supra; Mueller v Allen, 463 US 388, 394, quoting Hunt v McNair, 413 US 734, 741). Indeed, individual Justices of the United States Supreme Court have expressed varying viewpoints on the continued utility and vitality of the Lemon test (see, Allegheny County v Greater Pittsburgh Am. Civ. Liberties Union, 492 US 573, 625, supra *339 [O’Connor, J. concurring]; Edwards v Aguillard, 482 US 578, 636-640, supra [Scalia, J., dissenting]; Aguilar v Felton, 473 US 402, 419, supra [Burger, Ch. J., dissenting]; Wallace v Jaffree, 472 US 38, 68-69 [O’Connor, J., concurring], and 113 [Rehnquist, J., dissenting], supra; Lynch v Donnelly, 465 US 668,687-689, supra [O’Connor, J., concurring]; see also, Lee v Weisman, 505 US —, 112 S Ct 2649). Nevertheless, we are unanimous that the Lemon analysis persists as the governing precedent and guide in this area (see, Bowen v Kendrick, 487 US 589, 602, quoting Mueller v Allen, 463 US 388, 394, supra; Matter of Klein [Hartnett], 78 NY2d 662, 666, supra).
The United States Supreme Court has "particularly relied on Lemon in every case involving the sensitive relationship between government and religion in the education of our children”, a point strongly emphasized by appellant Association (Grand Rapids School Dist. v Ball, 473 US 373, 383, supra; see, Edwards v Aguillard, 482 US 578, 584, supra). In this context, we proceed to examine and apply the Lemon test to the challenged portion of the regulations.
The Association concedes that the regulations have a secular purpose. Indeed, it is facially evident that the compelling purpose of the regulations is to acquire broad and early community input and then to disseminate accurate information about the AIDS epidemic to as many schoolchildren as possible.
The focus of appellant’s sharpest and strongest attack is on the failure of the regulations to overcome the second prong of the Lemon test — that the principal or primary effect must not advance religion. A particular concern under the "effects” prong is "whether the symbolic union of church and state effected by the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices” (Grand Rapids School Dist. v Ball, 473 US 373, 390, supra; see, Allegheny County v Greater Pittsburgh Am. Civ. Liberties Union, 492 US 573, 595-597, supra). Context determines whether particular governmental action is likely to be perceived as an endorsement of religion (see, Allegheny County v Greater Pittsburgh Am. Civ. Liberties Union, supra, at 595-597). Governmental action "endorses” religion if it favors, prefers, or promotes it (see, Edwards v Aguillard, 482 US 578, 593, supra; Wallace v *340 Jaffree, 472 US 38, 59-60, supra; Lynch v Donnelly, 465 US 668, 691, supra). The regulations do not have any of those forbidden effects, despite the conclusory and speculative assertions in the dissenting opinion.
The Association specifically urges that the regulations unconstitutionally advance religion because they mandate representation on the public school advisory councils from among members of religious organizations while failing to list other community groups, and therefore make adherence to religion a relevant qualification to representation on the councils. The Association argues that this conveys a message of endorsement of religion and thus creates the forbidden "symbolic link” between church and State. The argument with respect to this prong does not survive analysis.
The "endorsement test” does not "preclude government from acknowledging religion or from taking religion into account in making law and policy” (Wallace v Jaffree, 472 US 38, 70, supra [O’Connor, J., concurring]; see also, Allegheny County v Greater Pittsburgh Am. Civ. Liberties Union, 492 US 573, 625, supra [O’Connor, J., concurring]). In the context of the extremely sensitive, complex, and escalating threat which society faces from AIDS — unless the broadest audience is reached as early as possible with the most accurate education program possible — it is particularly sensible for government to add the views of religious representatives on an advisory level to the predominant views it will receive from the rest of the community (see, Bowen v Kendrick, 487 US 589, 607, supra). Indeed, by including and considering the views of members of the community who are affiliated with religious organizations, the Commissioner insures that the AIDS instruction that is eventually adopted will more likely enjoy greater societal consensus and, therefore, greater secular effectiveness. By thus neutralizing or reducing possible objections from parents and subsequent opt-outs by schoolchildren, a more universal education program is likely to result (see, Ware v Valley Stream High School Dist., 75 NY2d 114 [involving a religious group’s claim under the Free Exercise Clause to exemption from the regulations requiring AIDS instruction in schools]). Thus, the principal, primary effect of the challenged portion of the regulations is to advance rational, legitimate, educational and secular goals, not to favor or prefer religious ones.
An important component in the analysis of the "effects” prong, which the dissenting opinion summarily dismisses (dis *341 senting opn, at 346-347), is that the councils serve in a purely advisory role to the trustees and the boards of education, which retain the unfettered and nondelegable public responsibility and discretion to adopt or reject any advisory views in whole or in part. This feature confirms the secondary, incidental nature and effects of that aspect of the regulations which mandates that advisory council membership include persons from religious organizations (see, Bowen v Kendrick, 487 US 589, 607, 612-613, supra; Lynch v Donnelly, 465 US 668, 683, supra). In this context, we conclude that it is not sufficiently likely that religious adherents or nonadherents would perceive from the inclusion of representatives from religious organizations on AIDS advisory councils that the State is endorsing or disavowing religion or nonbelievers. The second prong is not violated by these regulations in this respect.
The Association further argues that inclusion of community representatives from religious organizations is likely to be perceived as an endorsement of religion because the regulations fail to list other community groups as mandatory participants on advisory councils. The dissenting opinion mistakenly concludes that the regulations mandate the inclusion of "religious leaders” and claims that such persons are given "favored status” and "greater participatory privileges” than other community representative participants on the councils (dissenting opn, at 345, 346, 348, 349). This is characterized as "preferential”, "automatic access to the governmental decision-making” (dissenting opn, at 346, 347). The assertion that representatives from religious organizations are invested with a greater role than other included individuals or "community representatives” is mistaken. No hierarchy or preferential weight is established or ascribed in the regulations, and none can be inferred on this facial analysis. The mandatory list of participants on the councils includes "parents, school board members, appropriate school personnel, and community representatives, including representatives from religious organizations.” There is no fixed over-all number of representatives or proportionate allocation or distribution among the categories. By requiring a cross-section, of community persons and entities to contribute to the development of the AIDS instruction, without restriction or further specification, the regulations reach out to the broadest possible network of input and viewpoints. We conclude that the challenged composition of advisory councils is not sufficiently likely to give rise to a perception that the government has favored or preferred *342 religious over nonreligious groups. The Commissioner instead has "successful[ly] maint[ained] * * * 'a course of neutrality among religions, and between religion and nonreligion’ ” on the face of the promulgated regulations (Bowen v Kendrick, 487 US 589, 607, quoting Grand Rapids School Dist. v Ball, 473 US 373, 382, supra).
The Association additionally challenges the regulations as unconstitutional under the third prong of the Lemon test, arguing that they foster an excessive entanglement with religion. To evaluate this prong, courts must examine “the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority” (Lemon v Kurtzman, 403 US 602, 615, supra). The test is "inescapably one of degree” (Walz v Tax Commn., 397 US 664, 674), because some degree of entanglement between government and religion is inevitable given the complexity of modern society (see, Larkin v Grendel's Den, 459 US 116, 123; Lemon v Kurtzman, 403 US 602, 614, supra). The “excessive entanglement” concept has its genesis in a tax-exemption case (Walz v Tax Commn., supra). It has primarily been implicated in cases involving public financial aid to parochial schools, with the concomitant need for administrative interaction and ongoing supervision and monitoring to ensure the absence of a religious message (see, Aguilar v Felton, 473 US 402, supra; Lemon v Kurtzman, 403 US 602, supra; see also, Bowen v Kendrick, 487 US 589, supra). It has also been implicated in cases in which discretionary governmental powers are delegated to or shared with religious institutions (see, Larkin v Grendel's Den, 459 US 116, 127, supra).
Obviously, the ongoing monitoring and supervision required in connection with the administration of financial aid regulations is not implicated here, and religious institutions are not exercising any discretionary governmental functions in this case.
The Association nevertheless argues that “excessive entanglement” will result when boards of education or trustees face the task of sifting through the recommendations of the advisory councils to screen out those that may represent religious dogma or tenets which could impermissibly advance religion. We agree with the Appellate Division that this argument is entirely speculative. The recommendations that may emerge from advisory councils — not necessarily from the individuals *343 who constitute the councils — may not include religious viewpoints as such or at all. The supposed sifting methodology is not necessary or inherent to the consideration and analysis of advisory council recommendations by the boards and trustees under the facially challenged regulations. Indeed, given the almost certainly dominant secular membership of the councils, any religious input is not likely to rise to anything approaching the required "excessive” entanglement level.
The Association alternatively argues, and the dissenting opinion seems to agree (dissenting opn, at 348), that there will be a need to choose representatives from among many religious organizations active in a community, and that this will lead to political divisiveness and excessively entangle school boards in matters of different religions. This argument, too, has a speculative "as applied” analytical flavor and has no merit or record support.
In sum, the Association’s facial constitutional challenge to the mandated inclusion of representatives from religious organizations in public school AIDS education advisory councils fails under all the Lemon prongs.
Accordingly, the order of the Appellate Division should be affirmed, with costs.