81 N.Y.2d 518 (1993)
618 N.E.2d 94
601 N.Y.S.2d 61
Louis Grumet, Individually and as Executive Director of the New York State School Boards Association, Inc., et al., Respondents,
v.
Board of Education of the Kiryas Joel Village School District et al., Appellants.
Court of Appeals of the State of New York.
Argued April 29, 1993.
Decided July 6, 1993.
Nathan Lewin and Lisa D. Burget, of the District of Columbia Bar, admitted pro hac vice, and DeLorenzo, Gordon, Pasquariello, Weiskopf & Harding, P. C., Schenectady (Eric A. Tepper of counsel), for Board of Education of the Kiryas Joel Village School District, appellant.
Ingerman, Smith, Greenberg, Gross, Richmond, Heidelberger, Reich & Scricca, Northport (Lawrence W. Reich of counsel), for Board of Education of the Monroe-Woodbury Central School District, appellant.
Jay Worona, Slingerlands, and Pilar Sokol for respondents.
Robert Abrams, Attorney-General, Albany (Julie S. Mereson, Jerry Boone and Peter H. Schiff of counsel), in his statutory capacity under Executive Law § 71.
Marc D. Stern, New York City, and Lois C. Waldman for the American Jewish Congress, amicus curiae.
Gary J. Simson, Ithaca, and Glenn G. Galbreath for the Anti-Defamation League, amicus curiae.
Stanley Geller, New York City, for Committee for Public Education and Religious Liberty, amicus curiae.
Bernard F. Ashe, Albany, Gerard John De Wolf and Rocco A. Solimando for New York State United Teachers, amicus curiae.
Chief Judge KAYE and Judges SIMONS and HANCOCK, JR., concur with Judge SMITH; Chief Judge KAYE and Judge HANCOCK, JR., concur in separate concurring opinions; Judge BELLACOSA dissents and votes to reverse in another opinion in which Judge TITONE concurs.
*522 SMITH, J.
Plaintiffs, citizen taxpayers of this State, maintained this action against defendants Board of Education of the Kiryas Joel Village School District and Board of Education of the Monroe-Woodbury Central School District, challenging the enactment of chapter 748 of the Laws of 1989. That statute established a separate public school district in and for the Satmarer Hasidic Village of Kiryas Joel, Orange County.[1] Plaintiffs alleged that chapter 748 of the Laws of 1989 violates the Establishment Clause of the First Amendment of the Federal Constitution. Supreme Court granted plaintiffs' summary judgment motion, concluding, inter alia, that chapter 748 of the Laws of 1989 has the effect of advancing the religious beliefs of the Satmarer Hasidim inhabitants of the *523 Village of Kiryas Joel. The Appellate Division affirmed (187 AD2d 16), determining that the challenged statute violates the second prong of the test in Lemon v Kurtzman (403 US 602). Defendants appeal as of right from the order of the Appellate Division which finally determines an action that directly involves the construction of the Federal Constitution (CPLR 5601 [b] [1]). The issue before us is whether chapter 748 of the Laws of 1989, entitled "AN ACT to establish a separate school district in and for the village of Kiryas Joel, Orange county", violates the Establishment Clause of the First Amendment of the Federal Constitution. We now modify the order of the Appellate Division, agreeing that the statute violates the Establishment Clause of the First Amendment of the Federal Constitution.

I.
The Village of Kiryas Joel was formed by, and is composed almost entirely of members of the Satmarer Hasidic sect. In addition to separation from the outside community, separation of the sexes is observed within the Village. Yiddish is the principal language of Kiryas Joel. No television, radio, or English language publications are generally used. There is a male and female dress code. For the most part, the children are educated in religiously affiliated schools. The boys attend the United Talmudic Academy and are educated in the Torah. The girls attend Bais Rochel and are instructed on what they will need to function as adult women (see, Board of Educ. v Wieder, 72 N.Y.2d 174, 179-180). These differences have led to a series of court cases involving the Satmarer Hasidim.[2]
Prior to the decision of the United States Supreme Court in Aguilar v Felton (473 US 402 [1985]), the handicapped children living in Kiryas Joel received special education services *524 from Monroe-Woodbury Central School District personnel in an annex to one of the Kiryas Joel religious schools. In Aguilar, the United States Supreme Court considered whether a program under title I of the Elementary and Secondary Education Act of 1965 authorizing the use of Federal funds to pay salaries of public employees who teach in parochial schools violated the Establishment Clause of the First Amendment. Concluding that such a program was unconstitutional, the Court stated: "We have long recognized that underlying the Establishment Clause is `the objective . . . to prevent, as far as possible, the intrusion of either [church or state] into the precincts of the other * * *' Lemon v. Kurtzman, supra, at 614" (id., at 413) and "the scope and duration of [the] Title I program would require a permanent and pervasive state presence in the sectarian schools receiving aid." (Id., at 412-413.) In response to the Aguilar decision, the Monroe-Woodbury Central School District stopped providing the special education programs at the religious school annex. For some time thereafter, some of the handicapped Satmarer Hasidic children attended special education classes held at the Monroe-Woodbury public schools. However, allegedly because of the "panic, fear and trauma [the children] suffered in leaving their own community and being with people whose ways were so different from theirs," the parents stopped sending them to programs offered at the public schools (Board of Educ. v Wieder, 72 NY2d, at 181, supra).
In Board of Educ. v Wieder (supra) this Court construed Education Law § 3602-c[3] to authorize special education services to private school handicapped children and afford them an option of dual enrollment in public schools. We concluded that section 3602-c neither compels boards of education to make special education services available to private school handicapped children only in regular public school classes and programs, nor renders them powerless to provide otherwise (id., at 187).
Thereafter, the Legislature enacted chapter 748 of the Laws *525 of 1989, which created a new union free school district, the Kiryas Joel Village School District, in the Incorporated Village of Kiryas Joel in the Town of Monroe, Orange County. The newly established Kiryas Joel Village School District was coterminous with the Satmarer Hasidic community of Kiryas Joel, and was created within the boundaries of the Monroe-Woodbury Central School District. Chapter 748 of the Laws of 1989 also established a board of education, composed of five to nine members elected by the voters of the Village, that would serve for a period not to exceed five years. Chapter 748 of the Laws of 1989 represents "an effort to resolve a longstanding conflict between the Monroe-Woodbury School District and the village of Kiryas Joel, whose population are all members of the same religious sect" (Governor's Approval Mem, 1989 NY Legis Ann, at 324).
Plaintiffs Louis Grumet and Albert Hawk commenced this action individually, as citizen taxpayers, and as Executive Director of the New York State School Board Association, Inc. and President of the New York State School Boards Association, Inc., respectively, against the New York State Education Department and various State officials, alleging, inter alia, that chapter 748 of the Laws of 1989 violates the Establishment Clause of the First Amendment of the Federal Constitution. The Board of Education of the Kiryas Joel Village School District and the Board of Education of the Monroe-Woodbury Central School District intervened as defendants. The parties stipulated to a discontinuance of the action as to the State officials, but, pursuant to Executive Law § 71, the State Attorney-General continued to appear in this action in support of the constitutionality of chapter 748 of the Laws of 1989. Both parties sought summary judgment. On their motion, plaintiffs asserted that chapter 748 violates the Federal constitutional provisions prescribing separation of church and State. Defendants sought a judgment declaring the facial constitutionality of the statute.
Supreme Court granted plaintiffs' summary judgment motion, concluding that the statute is unconstitutional because it "was enacted to meet exclusive religious needs and has the effect of advancing, protecting and fostering the religious beliefs of the inhabitants of the school district[, and] * * * fosters excessive entanglements with religion" (Grumet v New York State Educ. Dept., 151 Misc 2d 60, 64). The Appellate Division affirmed, concluding that chapter 748 of the Laws of 1989 "authorizes a religious community to dictate where *526 secular public educational services shall be provided to children of the community [and] * * * creates the type of symbolic impact that is impermissible under the second prong of the Lemon test" (187 AD2d 16, 22, supra).
The prior courts concluded that plaintiffs fulfill the requirement for citizen-taxpayer status contained in State Finance Law § 123-a and, therefore, have standing to maintain this action. That conclusion is not contested on this appeal.

II.
Before this Court, defendants maintain that, based on Lemon v Kurtzman (supra), chapter 748 is constitutionally valid on its face.
The Establishment Clause of the First Amendment states that "Congress shall make no law respecting an establishment of religion" (US Const 1st Amend). The First Amendment is made applicable to the States by the Fourteenth Amendment (see, Everson v Board of Educ., 330 US 1; Murdock v Pennsylvania, 319 US 105). It is said that the Establishment Clause of the First Amendment means at least that "[n]either a state nor the Federal Government * * * can pass laws which aid one religion, aid all religions, or prefer one religion over another" (Everson, 330 US 1, 15, supra). As such, Federal and State governments must "maintain a course of neutrality among religions, and between religion and non-religion" (Grand Rapids School Dist. v Ball, 473 US 373, 382).
In Lemon v Kurtzman (supra) the United States Supreme Court articulated a three-part test for evaluating the constitutionality of governmental actions under the Establishment Clause. The Court stated:
"Every analysis in this area must begin with consideration of the cumulative criteria developed by the Court over many years. Three such tests may be gleaned from our cases. First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, Board of Education v. Allen, 392 U.S. 236, 243 (1968); finally, the statute must not foster `an excessive government entanglement with religion * * *' Walz [ v Tax Commn., 397 US 664, 674]" (id., at 612-613).
The United States Supreme Court has "particularly relied on Lemon in every case involving the sensitive relationship *527 between government and religion in the education of our children" (Grand Rapids School Dist. v Ball, 473 US 373, 383, supra). Recently, the Court adhered to the Lemon test in Lamb's Chapel v Center Moriches Union Free School Dist. (508 US ___, 113 S Ct 2141, 124 L Ed 2d 352). Moreover, the Court has applied Lemon in considering whether prior courts were correct in concluding, on a motion for summary judgment, whether a statute was unconstitutional on its face (see, Bowen v Kendrick, 487 US 589, 602). Likewise, we have applied the Lemon test to statutes or regulations relating to the education of children, where such statutes or regulations are challenged as violating the Establishment Clause (see, New York State School Bds. Assn. v Sobol, 79 N.Y.2d 333; Matter of Klein [Hartnett], 78 N.Y.2d 662). Thus, we apply the Lemon test to examine whether the prior courts were correct in concluding that chapter 748 of the Laws of 1989 is unconstitutional on its face.

III.
While both parties have briefed the first prong of the Lemon test, and the Supreme Court found a violation of that prong, the Appellate Division relied exclusively on the second prong and found it violated by the statute here. Because we conclude that the second prong of Lemon has been clearly violated, we do not address the first prong.
As stated, the second prong of Lemon requires that the principal or primary effect of legislation be one that neither advances nor inhibits religion. Thus, we consider whether the principal or primary effect of the challenged statute advances or inhibits religion. It is clear that the prohibition against State involvement in religion is not limited to direct and funded efforts to indoctrinate citizens in specific religious beliefs but includes a close identification of the responsibilities of government and religion (see, Grand Rapids School Dist. v Ball, 473 US 373, 389, supra). In that case, the Supreme Court stated the following:
"Our cases have recognized that the Establishment Clause guards against more than direct, state-funded efforts to indoctrinate youngsters in specific religious beliefs. Government promotes religion as effectively when it fosters a close identification of its powers and responsibilities with those of any  or all  religious denominations as when it attempts *528 to inculcate specific religious doctrines. If this identification conveys a message of government endorsement or disapproval of religion, a core purpose of the Establishment Clause is violated" (id., at 389).
In considering whether the principal or primary effect of the challenged statute advances or inhibits religion, the concern is "whether the symbolic union of church and state effected by the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by nonadherents as a disapproval, of their individual religious choices" (id., at 390). An inquiry into this kind of effect "must be conducted with particular care when many of the citizens perceiving the governmental message are children in their formative years [since t]he symbolism of a union between church and state is most likely to influence children of tender years" (id., at 390). Context determines whether a particular governmental action is likely to be perceived as an endorsement of religion (see, Allegheny County v Greater Pittsburgh ACLU, 492 US 573, 595-597). Governmental action "endorses" religion if it favors, prefers, or promotes it (see, Edwards v Aguillard, 482 US 578, 593; Wallace v Jaffree, 472 US 38, 59-60; Lynch v Donnelly, 465 US 668, 691).
Defendants assert that "[t]he relevant issue is whether an objective observer, acquainted with the text, legislative history, and implementation of the [challenged] statute, would perceive it as [the State's endorsement of the Satmarer Hasidic faith]" (Wallace v Jaffree, 472 US 38, 76, supra [O'Connor, J., concurring]). However, as the dissent acknowledges, "the Supreme Court has not yet adopted Justice O'Connor's [objective observer] nuance for detecting an [impermissible] endorsement" of religion by the State (dissenting opn, at 552). We agree with the majority of the Appellate Division that the statute not only authorizes a religious community to dictate where secular public educational services shall be provided to the children of the community, but also "creates the type of symbolic impact that is impermissible under the second prong of the Lemon test" (187 AD2d, at 22, supra).
Chapter 748 of the Laws of 1989 created a new union free school district, the Kiryas Joel Village School District, coterminous with the Incorporated Village of Kiryas Joel in the Town of Monroe, Orange County. This new school district was *529 created within the Monroe-Woodbury Central School District. The statute also established a board of education, composed of five to nine members elected by the voters of the Village, that would serve for a period not to exceed five years. The residents of the Village of Kiryas Joel are of the Satmarer Hasidic religious sect. Thus, only Hasidic children will attend the public schools in the newly established school district, and only members of the Hasidic sect will likely serve on the school board. We conclude that this symbolic union of church and State effected by the establishment of the Kiryas Joel Village School District under chapter 748 of the Laws of 1989 is sufficiently likely to be perceived by the Satmarer Hasidim as an endorsement of their religious choices, or by nonadherents as a disapproval of their individual religious choices. Thus, the principal or primary effect of chapter 748 of the Laws of 1989 is to advance religious beliefs.
The dissent's attempt to analogize this case to the recent Supreme Court case of Zobrest v Catalina Foothills School Dist. (509 US ___, 61 USLW 4641) is unavailing. In Zobrest, the petitioners, a deaf child and his parents, commenced the action challenging the school district's refusal to provide a sign language interpreter to accompany the child to classes at a Roman Catholic high school. The petitioners alleged that the Individuals with Disabilities Education Act (IDEA) and the Free Exercise Clause of the First Amendment to the Federal Constitution required the school district to provide the interpreter, and that the Establishment Clause did not bar such relief. Concluding that the Establishment Clause did not bar religious groups from receiving general, "neutral" governmental benefits such as a sign language interpreter, the Supreme Court held:
"The service at issue in this case is part of a general government program that distributes benefits neutrally to any child qualifying as `handicapped' under the IDEA, without regard to the `sectarian-nonsectarian, or public-nonpublic nature' of the school the child attends. By according parents freedom to select a school of their choice, the statute ensures that a government-paid interpreter will be present in a sectarian school only as a result of the private decision of individual parents. In other words, because the IDEA creates no financial incentive for parents to choose a sectarian school, an interpreter's presence there cannot *530 be attributed to state decisionmaking * * *. When the government offers a neutral service on the premises of a sectarian school as part of a general program that `is in no way skewed towards religion,' * * * it follows under our prior decisions that provision of that service does not offend the Establishment Clause" (509 US, at ___, 61 USLW, at 4644, supra).
We disagree with the dissent's assertion that "no message of endorsement for Satmar theology or its particular separatist tenets * * * can fairly be inferred" (dissenting opn, at 553) from a statute that creates a new school district within an existing school district and establishes a board of education, composed entirely of residents of the Village of Kiryas Joel who are of the Satmarer Hasidic religious sect. Here, unlike in Zobrest (supra) the statute creating a school district and establishing a board of education coterminous with the Satmarer Hasidic Village of Kiryas Joel cannot be viewed as part of a general government program. Rather, as stated, the statute represents an effort to resolve a long-standing conflict between the Monroe-Woodbury School District and the Village of Kiryas Joel, whose population are all members of the same religious sect. Thus, it cannot be said that by the creation of the Kiryas Joel Village School District, the government is offering "a neutral service * * * as part of a general program that `is in no way skewed towards religion.'"
The United States Supreme Court case of Wolman v Walter (433 US 229) is inapposite. There the Court held that "considerations of safety, distance, and the adequacy of accommodations" could justify a public school's provision of remedial services in mobile units located on neutral sites near nonpublic school premises (see, Wolman v Walter, 433 US, at 247, n 14, supra). Contrary to the assertion by the dissent, the legislation at issue in this case does not effect a "`unit on a neutral site'" serving only sectarian pupils (see, dissenting opn, at 554). Rather, the statute creates an entirely new school district coterminous with the Satmarer Hasidic community of Kiryas Joel and establishes a school board composed of members elected by the voters of the Village. This goes beyond any directive by the Supreme Court or this Court for the provision of special services to handicapped children at a neutral site (see, Wolman v Walter, 433 US 229, 248, supra; Board of Educ. v Wieder, 72 N.Y.2d 174, 188, supra).
*531 Because special services are already available to the handicapped children of Kiryas Joel, the primary effect of chapter 748 is not to provide those services, but to yield to the demands of a religious community whose separatist tenets create a tension between the needs of its handicapped children and the need to adhere to certain religious practices. Regardless of any beneficent purpose behind the legislation, the primary effect of such an extensive effort to accommodate the desire to insulate the Satmarer Hasidic students inescapably conveys a message of governmental endorsement of religion. Thus a "core purpose of the Establishment Clause is violated" (see, Grand Rapids School Dist. v Ball, 473 US 373, 389, supra).
Our conclusion does not, as the dissent declares, "drap[e] a drastic, new disability over the shoulders of young pupils solely on account of the religious beliefs of their community," nor does it "penalize and encumber religious uniqueness" (see, dissenting opn, at 557). Special services are made available to the Satmarer student within the Monroe-Woodbury School District. Our decision does not impose any additional burdens on the students within Kiryas Joel; it simply determines that the Legislature may not treat the Satmarer community as separate, distinct and entitled to special accommodation.

IV.
The Supreme Court has noted that "[i]f a statute violates any of [the three Lemon] principles, it must be struck down under the Establishment Clause" (Stone v Graham, 449 US 39, 40-41). Thus, our conclusion that chapter 748 of the Laws of 1989 violates the second principle of Lemon makes it unnecessary for us to comment on whether the statute violates the first and third principles or to address appellants' remaining contentions.
Without any separate analysis, the trial court declared the statute unconstitutional under article XI, § 3 of the State Constitution, suggesting that the provision is a "counterpart" to the Establishment Clause. The Appellate Division affirmed on both State and Federal constitutional grounds, although its discussion, like the trial court's, was limited to the Establishment Clause. Moreover, in this Court the First Amendment is the subject of the parties' focus. In these circumstances, we do not reach the State constitutional issue, which is based on a provision significantly different from the Establishment *532 Clause, both in text and history (see, Judd v Board of Educ., 278 N.Y. 200) and we modify the Appellate Division order accordingly.
Accordingly, the order of the Appellate Division should be modified, with costs to plaintiffs, in accordance with the opinion herein and, as so modified, affirmed.
Chief Judge KAYE (concurring).
Applying the three-pronged Lemon v Kurtzman (403 US 602) test, the Court concludes that creation of the Kiryas Joel Village School District violates the Establishment Clause. While I agree that chapter 748 of the Laws of 1989 breaches Lemon's second prong, and thus join the Court's opinion, I do not believe that Lemon supplies the preferred analytical framework for this case. Rather, in my view, legislation that singles out a particular religious group for special benefits or burdens should be evaluated under a strict scrutiny test, requiring that the law be closely fitted to a compelling State interest.
The law at issue is precisely the sort of legislation that should be strictly scrutinized, because it provides a particular religious sect with an extraordinary benefit: its own public school system. Although I am willing to assume that the law is addressed to a compelling governmental interest  providing special education and related services to disabled children who would otherwise go without such assistance  the law is not closely fitted to that purpose, as more moderate measures were available to satisfy that purpose. Accordingly, irrespective of the Lemon test,[1] I believe the law violates the Establishment Clause.

I.
My analysis begins with recognition that, factually, this case is unlike prior Supreme Court cases involving the relationship between religion and education. Prior cases generally fall into two broad categories: public aid to parochial schools *533 or students,[2] and religious activities within public schools[3] (see, Committee for Pub. Educ. v Nyquist, 413 US 756, 772 [identifying categories]). This case falls into neither category: the law does not provide aid to a parochial school, and it does not prescribe religious practices for a public school.
This case also differs from previous Establishment Clause education cases in a more fundamental respect. Chapter 748 is not one of the myriad "government programs that neutrally provide benefits to a broad class of citizens defined without reference to religion" (Zobrest v Catalina Foothills School Dist., 509 US ___, ___, 61 USLW 4641, 4643). Rather, the legislation was specifically designed to benefit Satmar Hasidim, who refuse to send their disabled children to integrated Monroe-Woodbury public schools. That the law is not part of a neutral, generally applicable program of State aid but instead was intended to benefit one religious group distinguishes this case, and calls for a different analysis.
*534 The Religion Clauses of the First Amendment protect fundamental liberties and therefore apply to the States through Fourteenth Amendment's Due Process Clause (Cantwell v Connecticut, 310 US 296, 303). Although the Equal Protection Clause of the Fourteenth Amendment has been a bulwark against arbitrary government distinctions based on race (Loving v Virginia, 388 US 1, 11), gender (Craig v Boren, 429 US 190, 197-199), national origin (Hernandez v Texas, 347 US 475, 479), alienage (Graham v Richardson, 403 US 365, 371-372) and illegitimacy (Trimble v Gordon, 430 US 762, 766), it has not been necessary to identify religion as a suspect classification for equal protection purposes; classifications along religious lines are strictly scrutinized in any event. "Just as we subject to the most exacting scrutiny laws that make classifications based on race, * * * or on the content of speech, * * * so too we strictly scrutinize governmental classifications based on religion" (Employment Div., Ore. Dept. of Human Resources v Smith, 494 US 872, 886, n 3 [citations omitted]; see, 3 Rotunda and Nowak, Constitutional Law: Substance and Procedure § 18.40, at 491-494 [2d ed 1992]).
"The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." (Larson v Valente, 456 US 228, 244.) It is thus axiomatic that the government must "maintain a course of neutrality among religions" (Grand Rapids School Dist. v Ball, 473 US 373, 382; see also, Epperson v Arkansas, 393 US 97, 104 ["The First Amendment mandates governmental neutrality between religion and religion"]; Zorach v Clauson, 343 US 306, 314 ["government must be neutral when it comes to competition between sects"]).
The State is in greatest danger of straying from its required course of neutrality when it selects a particular religious sect for special privileges or burdens. "`The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders'" (Church of Lukumi Babalu Aye v Hialeah, 508 US ___, ___, 113 S Ct 2217, 2227, quoting Walz v Tax Commn., 397 US 664, 696 [Harlan, J., concurring]). Laws intentionally designed to hamper a group's religious practices violate the Free Exercise Clause unless they are narrowly tailored to a compelling government interest (see, Church of Lukumi Babalu Aye, 508 US, at ___, 113 S Ct, at 2233). By the same token, a law affording a benefit to one religious group violates the Establishment *535 Clause if it too is not narrowly tailored to a compelling government interest.[4]
Larson v Valente (456 US 228) is a recent application of strict scrutiny to strike down a law under the Establishment Clause. In that case, a Minnesota statute imposed certain reporting requirements on charities but exempted religious organizations receiving more than half their contributions from members. The Court concluded that the Lemon test is intended "to apply to laws affording a uniform benefit to all religions" (456 US, at 252; see also, Corporation of Presiding Bishop v Amos, 483 US 327, 339), but that when a law expresses "a denominational preference, our precedents demand that we treat the law as suspect and that we apply strict scrutiny in adjudging its constitutionality." (456 US, at 246; see also, Smith, 494 US, at 886, n 3; Allegheny County v Greater Pittsburgh ACLU, 492 US 573, 608-609; Lynch v Donnelly, 465 US 668, 687, n 13.)
The Larson Court determined that the distinction between religious groups was a legislatively-sanctioned denominational preference, and thus the law was invalid unless it was justified by a "compelling governmental interest" and was "closely fitted to further that interest" (456 US, at 247). The Court assumed that the statute was addressed to a compelling governmental interest  protecting citizens against abusive solicitation practices  but concluded that it was not "closely fitted" to that interest and therefore violated the Establishment Clause (456 US, at 248-251).
Larson is of course distinguishable from the present case in that the Minnesota statute discriminated among religions while here the law is aimed simply at one religion. In my view, however, that distinction does not necessarily alter the analysis. A forbidden denominational preference can result from a grant of benefits to one religious group as readily as discrimination among sects. In either case, the specter of official favoritism looms large, and the legislation should be carefully scrutinized.

*536 II.
The creation of the carved-out school district is precisely the type of legislation that should be subjected to strict scrutiny. Although the law does not, on its face, make reference to the Satmar Hasidic sect, "[f]acial neutrality is not determinative" (Church of Lukumi Babalu Aye v Hialeah, 508 US, at ___, 113 S Ct, at 2227). No one disputes that purpose of the law was to create a new school district to provide disabled children of the Satmar faith with special education services in a segregated environment. Accordingly, in these circumstances the coterminality of the school district and the Village is of no moment (see, dissenting opn, at 549): the law was "an effort to resolve a longstanding conflict between the Monroe-Woodbury School District and the village of Kiryas Joel, whose population are all members of the same religious sect." (Governor's Mem, 1989 McKinney's Session Laws of NY, at 2429 [emphasis added].) Without doubt, the law was designed to confer a benefit on a particular religious group.
Plainly this special interest legislation cannot be equated with the statutory scheme in Zobrest v Catalina Foothills School Dist. (509 US ___, 61 USLW 4641) (see, dissenting opn, at 551, 552, 554-555). There, a parochial school student sought a sign language interpreter as "part of a general government program that distributes benefits neutrally to any child qualifying as `handicapped' under the IDEA, without regard to the `sectarian-nonsectarian, or public-nonpublic nature' of the school the child attends" (509 US, at ___, 61 USLW, at 4644). Thus, the law was entirely neutral in relation to individual religions. Here, by contrast, the State engaged in de jure segregation for the benefit of one religious group. Establishment of a public school district intentionally segregated along religious lines is a classic example of government action that must be "survey[ed] meticulously."
Turning then to the required strict scrutiny, I assume, for sake of analysis, that the "intractable problem" (Governor's Mem approving L 1989, ch 748, 1989 McKinney's Session Laws of NY, at 2429) of delivering special education services to Satmar children presented a compelling, secular government interest. Indeed, if protecting citizens against abusive solicitation practices may be considered compelling (see, Larson v Valente, 456 US, at 248), surely the provision of special education services qualifies.
Nevertheless, in my view the statute violates the Establishment *537 Clause because the legislative response plainly went further than necessary to resolve the problem. While defendants and the dissent characterize the new school district simply as a "neutral site" for the delivery of special services (see, Wolman v Walter, 433 US 229, 248), this legislation, establishing an entirely new and separate school district, is significantly broader. Interestingly, although the dissent stresses that only a facial challenge is presented, it relies on how the statute has been implemented  for example, that the new district presently provides only special education services. On this facial challenge, the Court must consider the full scope of the statute, which creates a new school district vested with "all the powers and duties of a union free school district" (L 1989, ch 748; emphasis added).
The impact of the Legislature's remarkable action of carving out a new school district coterminous with a religious enclave must not be assessed in a vacuum but measured against history. For almost 40 years, ever since the landmark decision in Brown v Board of Educ. (347 US 483), government-sponsored segregation efforts have been unlawful (see, e.g., United States v Scotland Neck Bd. of Educ., 407 US 484, 489-490 [carving out new school district from existing one impermissible because it impedes desegregation]; compare, Education Law § 2590-b [3] [a] [vi] ["heterogeneity of pupil population" a criterion in creating local school districts]; Mississippi Univ. for Women v Hogan, 458 US 718 [gender-based admissions policy unconstitutional]). Against this historical backdrop, the "symbolic impact" (Grand Rapids School Dist. v Ball, 473 US, at 390) of creating a new school district to serve the needs of a particular religious group cannot be overstated.
The law's overbreadth, however, goes beyond symbolism. The impasse between Monroe-Woodbury and the Satmarer concerned only special education services for disabled children. Nevertheless, the Legislature responded by creating a new public school district vested with all the powers of a union free school district, which are vast.[5] Thus, for example, there is no legal impediment to the new district's operation of *538 a public school program for nondisabled children if it chose to do so. Manifestly, the delegation of such power to the new district demonstrates that the legislation exceeded the problem that engendered it.
Perhaps the best evidence that the Legislature's resolution was not closely fitted to the problem was the availability of more moderate measures to accomplish its goal (see, Church of Lukumi Babalu Aye, 508 US, at ___, 113 S Ct, at 2229-2230). Accepting the parents' stated reasons for not sending their children to the public schools  psychological harm to the children from being thrust into a strange environment  then presumably the parents would be satisfied with a program directed to mitigating that trauma, without necessarily segregating the children.
Even if some sort of separate educational services were the only viable alternative, that could have been achieved without carving out a new school district. The Legislature could have, *539 for example, enacted a law providing that the Monroe-Woodbury School District should furnish special education services to these children at sites not physically or educationally associated with their parochial schools. That would have satisfied the parents, and would supersede any residual claim by the District that New York statutory law precludes that action.
Such narrowly tailored legislation would not, in my view, offend the Establishment Clause. In Wolman v Walter (433 US 229, 248), the Supreme Court held that "providing therapeutic and remedial services at a neutral site off the premises of the nonpublic schools will not have the impermissible effect of advancing religion." The Court had struck down previous efforts to provide remedial services on the premises of parochial schools (see, Meek v Pittenger, 421 US 349, 367-372), but as the Court explained in Wolman, the "dangers perceived in Meek arose from the nature of the institution, not from the nature of the pupils" (Wolman v Walter, 433 US, at 247-248; see also, Grand Rapids School Dist. v Ball, 473 US 373, 386-389; Aguilar v Felton, 473 US 402, 412). In the present circumstances, a law providing special education services to Satmar children at neutral sites can be considered closely fitted to a compelling government interest. Creating a new public school district cannot.
The foregoing analysis is consistent with, and indeed substantially overlaps, Lemon's second prong. The government may not make religion relevant to a person's political standing in the community (Lynch v Donnelly, 465 US 668, 687 [O'Connor, J., concurring]). If the government's response to a problem affecting a religious group is broader than reasonably necessary, it presents at least the perception of official favoritism or endorsement of that religion, in violation of Lemon's second prong (see, Allegheny County v Greater Pittsburgh ACLU, 492 US 573, 592-594, supra). By carving out a fully empowered, whole new school district in these circumstances, the Legislature has also transgressed Lemon.

III.
This Court's decision returns the parties to square one. It is ironic that in the wake of the Legislature's creation of a new school district for the Satmar, Monroe-Woodbury now argues that the "provision of secular instructional services to students of the same faith at a neutral site is constitutionally *540 permissible." This approach by Monroe-Woodbury could well obviate the need for any further legislative intervention.
HANCOCK, JR., J. (concurring).
I join in Judge Smith's opinion that chapter 748 of the Laws of 1989 has a primary effect of advancing religion and for that reason violates the Establishment Clause. I agree with the majority that it is, therefore, unnecessary to decide whether chapter 748 also violates the first or purpose test of Lemon v Kurtzman (403 US 602). However, if the Court were addressing that issue, I would hold  as Supreme Court and, in my view, the Appellate Division majority do  that the statute also violates the first Lemon test (see, Wallace v Jaffree, 472 US 38, 56, 64 [Powell, J., concurring], 75 [O'Connor, J., concurring]).[1] As the Appellate Division majority pointed out:

"The challenged statute, therefore, was designed * * * to provide * * * [special education] services within the Village so that the children would remain subject to the language, lifestyle and environment created by the community of Satmarer Hasidim and avoid mixing with children whose language, lifestyle and environment are not the product of that religion. The dissent finds a secular purpose for the statute in that it would provide the handicapped children of the Village with the *541 publicly supported, secular special educational services they need and to which they are entitled, but as previously noted those services were already available to all of the handicapped children of the Monroe-Woodbury District, including the handicapped children of the Village. Thus, the only secular need for the statute recognized by the dissent did not, in fact, exist" (Grumet v Board of Educ., 187 AD2d 16, 21 [emphasis added]).
Chapter 748 creates a special union free school district solely for the Village of Kiryas Joel so that its residents, almost all of whom are of the Satmarer Hasidic faith, may receive separate educational services for their handicapped children at public expense in place of the services which are already available to them as residents of the Monroe-Woodbury School District. Obviously, the purpose of chapter 748 could not have been to meet the need of the residents of Kiryas Joel for special education services; such services were already available to them under State law as to all other residents of the Monroe-Woodbury School District. What is involved here is a special act of legislative and executive grace which makes available to the Kiryas Joel residents public education services to which they would not otherwise be entitled (contrast, Zobrest v Catalina Foothills School Dist., 509 US ___, 61 USLW 4641 [where any child qualifying under a general government program for deaf children was entitled to benefits as a matter of right "without regard to the `sectarian-nonsectarian, or public-nonpublic nature' of the school the child attends" (id., 509 US, at ___, 61 USLW, at 4644). In sum, chapter 748 was enacted solely as an accommodation, not as the fulfillment of an entitlement.
Was the purpose of this accommodation anything other than religious? Unquestionably, the accommodation was to meet a requirement peculiar to the residents of Kiryas Joel  that their children be permitted to associate only with children of the Satmar Hasidic sect. As I read the record, there is no dispute: (1) that the mandate of a separate and isolated existence is an important tenet in the Satmar Hasidic religious doctrine and inherent in the Satmar culture and way of life; or (2) that it is particularly important that this requirement of separation be strictly observed in the upbringing and education of Satmar children.
Creating the special school district which encompasses only *542 the Village of Kiryas Joel achieved this accommodation; special education could be furnished to the children of Kiryas Joel through their own exclusive program inside the Village limits where the children would mix only with the children of the Satmar faith. That a statute which is clearly intended to meet the special religious requirements of a particular sect is a statute having a religious purpose seems self-evident. If more is needed, it may be found in the record and the legislative history of chapter 748 (see, Bill Jacket, L 1989, ch 748; see also, Lentol Mem and Silver Mem, supra, n 1), and, indeed, in our prior decision concerning the special education for the children of this very Village (Board of Educ. v Wieder, 72 N.Y.2d 174, 179-180, supra).
It is argued, however, that the legislative purpose of chapter 748 was to obviate the emotional and psychological trauma of the children upon being taken from the isolation of their unique community and placed with other children whose ways are different from theirs, and that, thus, the statute has a secular purpose. But, there is nothing in the statute or its legislative history suggesting that the enactment of chapter 748 was related to the psychological stress of the children or prompted by anything other than the well-meaning desire to comply with the religious requirement of keeping the Satmarer children separate from other children, concededly the cause of whatever emotional or psychological effect the children may have suffered. Indeed, the Appellate Division noted:
"The record, however, contains uncontradicted evidence of a direct link between the language, lifestyle and environment of the community's children and the religious tenets, practices and beliefs of the community. Based upon similar evidence and in a similar procedural posture, the Court of Appeals had little difficulty finding such a connection. `With an apparent over-all goal that children should continue to live by the religious standards of their parents, "Satmarer want their school to serve primarily as a bastion against undesirable acculturation, as a training ground for Torah knowledge in the case of boys, and, in the case of girls, as a place to gather knowledge they will need as adult women"' (Board of Educ. v Wieder, supra, at 180 [emphasis supplied])" (Grumet, supra, at 23 [emphasis added]).
*543 The question is not whether some legislative solution for prescribing psychological services for the Satmar children could be devised that would have a secular purpose and thus meet the first Lemon test. We are concerned only with the legal question of the purpose of the specific legislation before us. Chapter 748 establishes what amounts to a private school to furnish special education services at public expense to the residents of Kiryas Joel in order to accommodate their religiously mandated requirement of separation for their children. It does so through the extraordinary means of creating within an existing school district another coexisting district designed only to include a village whose residents are almost exclusively of a particular religious sect.
If a statute does not have a clearly secular purpose, it fails the first or "purpose" test of Lemon (see, Wallace v Jaffree, 472 US 38, 56). Justice Powell's explanation of the first Lemon test in his Wallace concurrence is especially apt here:
"The first inquiry under Lemon is whether the challenged statute has a `secular legislative purpose.' Lemon v. Kurtzman, supra, at 612. As JUSTICE O'CONNOR recognizes, this secular purpose must be `sincere'; a law will not pass constitutional muster if the secular purpose articulated by the legislature is merely a `sham.' Post, at 75 (concurring in judgment). In Stone v. Graham, 449 U.S. 39 (1980) (per curiam), for example, we held that a statute requiring the posting of the Ten Commandments in public schools violated the Establishment Clause, even though the Kentucky Legislature asserted that its goal was educational" (Wallace, supra, at 64 [Powell J., concurring]).
But for the Satmarers' religious mandate of separation, no statute and no governmental expenditures for special education services for the residents of Kiryas Joel would have been necessary. In short, the accommodation of the Satmarers' religious requirements "`was and is the law's [only] reason for existence'" (Wallace, supra, at 75 [O'Connor J., concurring], quoting Epperson v Arkansas, 393 US 97, 108).
Realistically, can the legislative creation of the Kiryas Joel School District to make special additional educational services available in order to obviate the religious objections of its residents have a purpose other than religious? As a matter of common sense  given the wording of the statute, its apparent *544 intent and the absence of any reference to other than a religious purpose in the legislative history  the answer must be no.
Assuming, however, that chapter 748 can be construed as having a clearly secular purpose (see, Wallace, supra, at 56), I believe that, in its effect, it cannot be anything but a government action which unequivocally endorses religion in violation of the second Lemon test (see, Wallace, at 69 [O'Connor J., concurring]). Not only have the legislative and executive branches of government acted for the special benefit of a particular religious sect in creating the Kiryas Joel School District, but their action entails State aid which will relieve the private Talmudic academies and the residents of the Kiryas Joel Village of the financial burdens of providing required special education for the Satmarer children.[2] Thus, chapter 748  like the money grants for maintenance and repair, the tuition reimbursement grants, and the income tax benefits struck down in Committee for Pub. Educ. v Nyquist (413 US 758)  constitutes the sort of State financial assistance for sectarian education which has the effect of furthering the religious mission in contravention of the second Lemon test (see, Grand Rapids School Dist. v Ball, 473 US 373, 393-395; Meek v Pittenger, 421 US 349, 364-366; Aguilar v Felton, 473 US 402, 422 [O'Connor J., dissenting]). As the Supreme Court recently stated in regard to its holdings in Meek and Ball:
"[T]he programs in Meek and Ball  through direct grants of government aid  relieved sectarian *545 schools of costs they otherwise would have borne in educating their students. See Witters [v Washington Dept. of Servs. for Blind, 474 US 481], at 487 (`[T]he State may not grant aid to a religious school, whether cash or in kind, where the effect of the aid is "that of a direct subsidy to the religious school" from the State') (quoting Ball, supra, at 394). For example, the religious schools in Meek received teaching material and equipment from the State, relieving them of an otherwise necessary cost of performing their educational function. 421 U.S., at 365-366. `Substantial aid to the educational function of such schools,' we explained, `necessarily results in aid to the sectarian school enterprise as a whole,' and therefore brings about `the direct and substantial advancement of religious activity.' Id., at 366. So, too, was the case in Ball: The programs challenged there, which provided teachers in addition to instructional equipment and material, `in effect subsidize[d] the religious functions of the parochial schools by taking over a substantial portion of their responsibility for teaching secular subjects.' 473 U.S., at 397. `This kind of direct aid,' we determined, `is indistinguishable from the provision of a direct cash subsidy to the religious school.' Id., at 395." (Zobrest v Catalina Foothills School Dist., 509 US, at ___, 61 USLW, at 4644, supra).
BELLACOSA, J. (dissenting).
This case arises from a community's search for special education services on behalf of approximately 200 handicapped children who, as Satmarer Hasidic Jews, reside with their families in the Village of Kiryas Joel in Orange County, New York. A decade of controversy of virtually epic proportions is reflected in litigation at various levels of State and Federal courts and in unsuccessful efforts by various protagonists to forge a local, secular, public education program for the pupils with special needs of the Village of Kiryas Joel. The State of New York in 1989 enacted a law which held the promise of a Solomon-like solution.
Although invested with a presumption of constitutionality, that statute is judicially nullified as a violation, on its face, of the Establishment Clause of the First Amendment of the United States Constitution. Because I believe that the Court *546 has erected a reverse presumption of unconstitutionality and because I agree with Justice Levine, dissenting at the Appellate Division, that the law is not facially defective, I respectfully dissent and vote to reverse.

I.
Since 1977, the Village of Kiryas Joel has been an incorporated municipality in the Town of Monroe, Orange County, New York, populated by Satmarer Hasidic Jews. The lifestyle of the community  including distinctive dress, language, and customs  was described by this Court in Board of Educ. v Wieder (72 N.Y.2d 174, 179-180). Before the legislation at issue, all school children of the Village, for public education purposes, were within the jurisdiction of the Monroe-Woodbury School District. Those pupils in the Village without special needs, however, receive their schooling in Satmarer Hasidim parochial schools. They are not involved in this litigation.
The challenged legislation evolved out of a series of court cases involving disputes between the residents of the Village and the Board of Education of the Monroe-Woodbury School District (which is now aligned as a party in this lawsuit with the Kiryas Joel Board of Education) concerning the provision only of special education services to the handicapped children of the Village. In 1988, when Board of Educ. v Wieder (id.) was decided by this Court, the Monroe-Woodbury School District had offered the Village's handicapped students the special education services to which they were entitled under Federal and State law only at the district's public schools. The Satmarer Hasidic residents of the Village demanded a neutral site within the Village. This Court held that the courts could not mandate that the location of the services be either the district's public schools or a neutral site within the Village, though this Court also unanimously urged that efforts be undertaken by the protagonists to secure a neutral site and solution (Board of Educ. v Wieder, 72 NY2d, at 189, n 3, supra).
Both sides nevertheless persisted in their diametrically opposed positions, and the "true subjects of this controversy" (id., at 179), the handicapped Satmarer children, received no special education. The Satmarer Hasidim removed their special-needs children from the Monroe-Woodbury School District's public schools, after an experimental effort and period, because they felt that the district's failure to accommodate *547 their distinct language and cultural needs had a "major adverse effect on [their special-needs children's] educational progress" and on the children's psychological and emotional well-being. Ultimately, the New York State Legislature acted to end the long standoff.
Chapter 748 of the Laws of 1989 established "a separate school district in and for the village of Kiryas Joel, Orange county". The statute granted the new school district the powers of a union free school district under the State Education Law, and provided that the district shall be controlled by a board of education, elected by the qualified voters of the Village. The Monroe-Woodbury Board of Education unanimously supported the legislation, urging the Governor to sign the bill "because it will allow for the proper education of the Kiryas Joel handicapped children. * * * The creation of a separate school district will serve to reduce community tension and lead to productive relationships." (Bill Jacket, L 1989, ch 748.) Governor Cuomo approved the legislation, effective July 1, 1990, commenting in the official Approval Message that "[m]y Counsel * * * advises that the bill is, on its face, constitutional. I am persuaded by my Counsel's view. * * * [T]his bill is a good faith effort to solve this unique problem" (Approval Message of Governor, 1989 NY Legis Ann, at 324-325).
The new school district operates a public school which provides education only to the district's children with special needs. Under the statute, the district must operate in a secular manner. The superintendent of the school, who is not Hasidic, served for 20 years in the New York City public school system, where he acquired expertise in the area of bilingual, bicultural, special education for handicapped children. The teachers and therapists, all of whom live outside the Village, teach mixed classes of boys and girls a wholly secular curriculum of subjects, such as reading, writing, arithmetic, music and physical education. The statute requires the school to comply with all State laws, rules and regulations affecting public education, including a prohibition against any form of discrimination.

II.
The New York State School Boards Association (NYSSBA) and two of its officers instituted this action in January 1990 against the New York State Education Department and various *548 State officials, seeking a declaration of unconstitutionality of the statute. The Kiryas Joel and Monroe-Woodbury Boards of Education intervened as defendants. Although the parties stipulated to a discontinuance of the action as to the defendant State officials, the Attorney-General has continued to defend the constitutionality of chapter 748 (see, Executive Law § 71). The organizational plaintiffs (NYSSBA and Messrs. Grumet and Hawk, in their capacities as NYSSBA officers) were ultimately found to lack standing to challenge the statute, an aspect of the case not before us. However, the two named individuals remain as taxpayers plaintiffs-respondents.
Plaintiffs moved and defendants cross-moved for summary judgment on facial grounds only, inasmuch as no discovery or any other factual inquiry in this case has been undertaken. Supreme Court, Albany County, held that chapter 748, on its face, violated all three prongs of Lemon v Kurtzman (403 US 602) and therefore violated the principle of separation of church and State. The Appellate Division affirmed, holding that chapter 748, on its face, violates at least the second prong of the Lemon test because its primary effect is the advancement of religion. This Court also strikes the law down on only prong two, the primary effect aspect of Lemon, although the concurrences advance newly refined additional bases for invalidation.
Plaintiffs press their argument before this Court that chapter 748 violates all three prongs of the Lemon test. Although defendants-appellants proffered a secular purpose for the legislation, plaintiffs characterize it as a "sham" (Supreme Court referred to it as a "camouflage [of] secular garments" [151 Misc 2d 60, 64]). Plaintiffs allege that the purpose of the statute is to cater to the "religious separatist tenets" of the Satmar Hasidim. They also argue that chapter 748 has the primary effect of advancing the religious tenets of the Satmar Hasidim, because the statute allows them to maintain their separatism. Finally, they urge that it constitutes a State endorsement of religion.
Defendants-appellants reject plaintiffs' claims on the ground that plaintiffs have not met their heavy burden of rebutting the presumptive facial constitutionality of chapter 748 of the Laws of 1989 beyond a reasonable doubt. Defendants also demonstrate, to the contrary, that the statute should survive facial scrutiny on all three branches of the Lemon test and urge that it should not be struck down without evidentiary development and as-applied analysis.

*549 III.
No one disputes that the Legislature has the fundamental power to create a union free school district within the boundaries of a previously existing school district to facilitate the provision of public education to a particular group of students (see, e.g., Town of Greenburgh, UFSD No. 13, chapter 559 of the Laws of 1972; Town of Mt. Pleasant UFSD, chapter 843 of the Laws of 1970; Gananda School District Act, chapter 928 of the Laws of 1972). Plaintiffs concede that approximately 20 such school districts have been created by acts of the Legislature.
Nevertheless, plaintiffs predicate their challenge, to what is otherwise an entirely secular act of public education administration effected by the other two branches of State government, on their sectarian interpretation of the unique, overlapping cultural and religious characteristics of the population of the Village of Kiryas Joel and its identical geographical boundaries with the new school district. They assert that the citizens of Kiryas Joel are exclusively Satmarer Hasidim and will remain as such. However, no claim is made of any alleged restrictive covenants among the Village's property owners, or of any alleged irregularity in the conduct of municipal or school district elections, or of any exclusion of non-Hasidim in any respects of governance, employment or availment of educational services. Indeed, there is no showing that non-Satmarer Hasidim students are precluded from attending and taking advantage of this special education program. What plaintiffs assert, in sum, substance and effect, is that because the municipality and school district share identical borders and frame an enclave currently populated only by Satmarer Hasidim, the very existence of the public school district by authorization of the Legislature and executive constitutes, on its face, an establishment of religion prohibited by the United States Constitution. The logical and inexorable extension of this canon would dictate the extinguishment of the Village itself for the identical infirmity.

IV.
To evaluate plaintiffs' claims under the currently prevailing Lemon test, the Court must examine the purpose and effects of the legislation, as well as the possibility of government entanglement resulting from the legislation (see, New York State School Bds. Assn. v Sobol, 79 N.Y.2d 333, 338-339). *550 While many personal expressions of the Justices of the United States Supreme Court question the vitality of Lemon (see, Lamb's Chapel v Center Moriches Union Free School Dist., 508 US ___, ___, 113 S Ct 2141, 2149-2151 [June 7, 1993] [Scalia, J., concurring]), the institutional postulate of that Court remains unchanged  Lemon controls (id., 508 US, at ___, 113 S Ct, at 2148, and n 7 [White, J., opn of Court]). However, the analysis in an Establishment Clause case, decided 11 days later, abstains from discussion of the Lemon test (see, Zobrest v Catalina Foothills School Dist., 509 US ___, 61 USLW 4641 [June 18, 1993]).
The first Lemon prong  that "the statute must have a secular legislative purpose" (Lemon v Kurtzman, supra, at 612)  is breached only if the enactment was "motivated wholly by [a religious] purpose" (Bowen v Kendrick, 487 US 589, 602 [emphasis added]; see, Wallace v Jaffree, 472 US 38, 56). Chapter 748 was enacted for the stated purpose of allowing only handicapped pupils of the Village of Kiryas Joel to receive a publicly supported, secular special education to which they are entitled (see, Governor's Mem, 1989 NY Legis Ann, at 324-325). This objective satisfies the secular purpose prong of the Lemon test.
Next, in considering the facial attack, the Court seems satisfied that a third-prong violation, excessive entanglement, has not been demonstrated. The Kiryas Joel public school established for this Village is not a "pervasively sectarian environment" of the type which generally raises the entanglement problem (see, e.g., Aguilar v Felton, 473 US 402, 412; Meek v Pittenger, 421 US 349). The education program is exclusively and thoroughly nonsectarian; the staff is secular; all regulatory monitoring is of the traditionally accepted educational variety and is designed to assure that the secular staff adheres to the State-approved secular curriculum (see generally, Grumet v Board of Educ., 187 AD2d 16, 36-37 [Levine, J., dissenting]).
The Court's dispositive analysis turns ultimately on only the second Lemon prong, the "effects" test. Defendants contend that the educational services offered by Monroe-Woodbury School District prior to the enactment of chapter 748 were inadequate, because the services did not accommodate "the distinct language and cultural needs of the handicapped children" in the Village, and the primary effect of the legislation *551 is to remedy that problem. In bold dichotomy, plaintiffs' central argument that the primary effect of the statute involves "the State in sponsorship of Satmar separatist precepts" is adopted by the Court, contrary, in my view, to the spirit of the holding and analysis of Zobrest. The primary effect benefits the handicapped students in a secular manner; only an "attenuated" effect reaches the religion of their community.
As initially articulated, the effects prong demands of legislation that "its principal or primary effect must be one that neither advances nor inhibits religion" (Lemon v Kurtzman, supra, at 612). In subsequent application, the Supreme Court has augmented this restriction to require that any nonsecular effect be remote, indirect and incidental. Courts attempting to apply the "effects" test must also grapple with the related subsidiary concern of whether the governmental action constitutes an "endorsement" of religion. As Justice Kennedy recently observed, however, the Supreme Court's unsettled jurisprudence in the area of possible government "endorsement" of religion leaves this subbranch of the Lemon test somewhat suspect (see, Lamb's Chapel v Center Moriches Union Free School Dist., 508 US ___, ___, 113 S Ct 2141, 2149, supra [June 7, 1993] [Kennedy, J., concurring]).
The Supreme Court has used "endorsement" as a factor for assessing whether an impermissible purpose or effect infects a challenged law (see, e.g., Grand Rapids School Dist. v Ball, 473 US 373, 389); however, the meaning of "endorsement" is not "self-revealing" (compare, Church of Lukumi Babalu Aye v Hialeah, 508 US ___, ___, 113 S Ct 2217, 2241 [Souter, J., concurring]).
Unraveling whether a particular governmental action runs afoul of this test is a tricky and complicated process. Justice O'Connor initially proposed the "no endorsement" test in Lynch v Donnelly (465 US 668, 691-693 [O'Connor, J., concurring]). Its protean  and controversial  nature is evidenced by the fact that in that case she found that a municipality's display of a Christmas creche was not an endorsement of religion. In her view, the printing of "In God We Trust" on coins and the opening of court sessions with "God save the United States and this honorable court" were also not constitutionally offending endorsements (id., at 693).
Justice O'Connor in Wallace v Jaffree (472 US 38, supra) offered an "objective observer" refinement to the endorsement *552 factor. Much like the reasonable person embodied in the negligence standard, the so-called objective observer is expected to form a perception on the basis of familiarity with "the text, legislative history, and implementation of the statute" as to whether a particular State action constitutes an endorsement of religion or of a particular religious belief (id., at 76). Moreover, any objective observer would presumably also be "acquainted with the Free Exercise Clause and the values it promotes" (id., at 83). Thus, the objective observer should be aware of the overlap and tension between the Establishment and Free Exercise Clauses, and the permissibility of accommodation to Free Exercise concerns (id.). To be sure, the Supreme Court has not yet adopted Justice O'Connor's nuance for detecting an alleged endorsement, but neither has it otherwise clarified the method and criteria for unveiling an impermissible endorsement (see, e.g., Smith, Symbols, Perceptions, and Doctrinal Illusions: Establishment Neutrality and the "No Enforcement" Test, 86 Mich L Rev 266).
Reasonable minds may differ as to whether the actuality or the symbolism of the State's facilitation of publicly administered special education to handicapped pupils of an incorporated municipality is an endorsement of the children's or their parents' religion. To allow for no reasonable doubt on a facial review and to decide this case as a forbidden establishment of a religion is at least arguable. "Objective observers" could not, in my view, so definitively conclude or perceive this situation as an establishment of a religion, without inspiring some inquiry as to whether their views perhaps suffered from a predisposed hostility to religion in the constitutional debate sense. Truly objective observers should be able to conscientiously accept this legislation as secular, neutral and benign within the reasonable doubt spectrum (see, Tribe, American Constitutional Law, at 1176, 1187-1190, 1221 [2d ed]). For comparative analysis, as an example, one might view the direct aid to the handicapped pupil in a parochial school in Zobrest as the scaling of the wall of separation; yet, it was held constitutional under a broadly applicable analysis. In contrast, in this case the State stayed safely off and away from the forbidden wall by aiding a group of handicapped pupils in a specially created public school; yet, the Court here declares the legislative act unconstitutional. I find this perplexing, to say the least.
This Court has said that "[g]overnmental action `endorses' religion if it favors, prefers, or promotes it" (majority opn, at *553 528; see also, New York State School Bds. Assn. v Sobol, 79 NY2d, at 339, supra). In applying that proposition at face value, the Court concludes that Satmarer Hasidism is impermissibly favored, preferred or promoted by chapter 748. I disagree because context is key (see, New York State School Bds. Assn. v Sobol, supra). Here, no message of endorsement for Satmar theology or its particular separatist tenets need necessarily or can fairly be inferred, either by objective third parties or by the protagonists themselves. On the other hand, it can fairly be said that the people of the State of New York, as a whole, gain a compelling benefit in the compromise solution achieved here. The New York commonweal is primarily advanced. It should not be forgotten or overlooked that the long-simmering, underlying dispute spilled over the borders of the Village into the broader surrounding community, and resulted in a complete impasse. The legislation, judicially dissolved in this case, was the negotiated denouement at the highest policy level available in a democracy, the State Legislature. As Professor Tribe has noted, "[l]eaving room for legislatures to craft religious accommodations recognizes that they may be in a better position than courts to decide when the advantages of strict neutrality are overstated" (Tribe, American Constitutional Law § 14-7, at 1195 [2d ed] [emphasis added]). Former Justice Brennan emphasized this important nuance by observing that "even when the government is not compelled to do so by the Free Exercise Clause, it may to some extent act to facilitate the opportunities of individuals to practice their religion" (Marsh v Chambers, 463 US 783, 812 [Brennan, J., dissenting]).
The incidental, "attenuated" benefit to the minority Satmar viewpoint supports this State's rich pluralistic tradition and does not diminish, but rather enhances, the common good. I conclude that the incidental benefit to the Satmar Hasidim citizens does not render the State's legislative solution facially impermissible because:
"[i]t does not follow, of course, that government policies with secular objectives may not incidentally benefit religion. The nonsectarian aims of government and the interests of religious groups often overlap, and this Court has never required that public authorities refrain from implementing reasonable measures to advance legitimate secular goals merely because they would thereby relieve religious groups of costs they would otherwise *554 incur. See Mueller v. Allen, 436 U.S. 388, 393 (1983)." (Texas Monthly v Bullock, 489 US 1, 10.)
The unmistakable reality of this case is that the stricken legislation tried to create a secular public school for pupils with special education needs. The majority concludes that the effort fails. Yet, the new public school district offers programs and services at odds with many basic precepts of Satmarer Hasidism. Secularism itself is antithetical to Hasidism, yet secularism is the quid pro quo imposed by the State for these Village residents to avail themselves in this way of State-regulated special educational services for their handicapped youngsters. Though the Legislature bent over backwards, as a last resort, to address the legitimate special education needs of the Satmarer students, it did not bend to the theology of their families or community (see generally, Tribe, American Constitutional Law § 14-7, at 1195 [2d ed]). For its effort, the Legislature and executive and the citizens who sought recourse through the democratic process are deemed religious gerrymanderers and educational segregationists (see, concurring opn, Kaye, Ch. J., at 534, 538; contrast, Matter of Wolpoff v Cuomo, 80 N.Y.2d 70, 78-80).
On the other hand, there has been substantial approbation from the surrounding and affected non-Satmarer community for the fairness and equity of the State providing a secular solution for what had previously proved to be an intractable local dispute. Indeed, defendant-intervenor-appellant Board of Education of the Monroe-Woodbury Central School District has not regarded the legislation as a repudiation of the secular educational principles for which it previously and steadfastly fought as litigant against the Satmarer Hasidim, or as an approval of the separatist tenets of the Satmar. Although it was unable to achieve a solution on its own, its present amity is noteworthy (Board of Educ. v Wieder, 72 N.Y.2d 174, supra).
As the Supreme Court noted in Wolman, "[t]he fact that a unit on a neutral site on occasion may serve only sectarian pupils does not provoke the same concerns that troubled the Court in Meek [v Pittenger]" (Wolman v Walter, 433 US 229, 247). "The purpose of the program is to aid school children * * * Certainly the Establishment Clause should not be seen as foreclosing a practical response to the logistical difficulties of extending needed and desired aid to all the children of the community" (id., at n 14). The United States Supreme Court *555 built on those comments in Zobrest v Catalina Foothills School Dist. (509 US ___, 61 USLW 4641 [June 18, 1993], supra) by observing that "we have consistently held that government programs that neutrally provide benefits to a broad class of citizens defined without reference to religion are not readily subject to an Establishment Clause challenge just because sectarian institutions may also receive an attenuated financial benefit" (id., 509 US, at ___, 61 USLW, at 4643 [Rehnquist, Ch. J., opn of Court]). That is the substantive effect of this legislation. This Court, nevertheless, objects as to the form selected and prescribed by this State's Legislature and Executive.
In fact, Board of Educ. v Wieder (72 N.Y.2d 174, supra) aspirationally urged the provision of services separately to the handicapped students of Kiryas Joel, if Monroe-Woodbury School District could find a way to do so (id., at 189, n 3). Wolman was offered as authority and a guidepost of significant promise for the Legislature in promulgating its ultimate substantive result (id.). Ironically, the Legislature's action is criticized as radical and not sufficiently tailored (concurring opn, Kaye, Ch. J., at 532, 538).
I conclude that strong and sufficient authority and analysis, past and immediate, support the view that the principal or primary effect of the challenged legislation does not advance religion in this unique context, and that no endorsement of religion may be fairly inferred.

V.
This latest litigation reaches this Court by appeal as of right on constitutional grounds from the affirmance of summary judgment granted to plaintiffs in the Supreme Court declaring chapter 748 facially unconstitutional. In that procedural framework, of course, disputed inferences or factual issues must be viewed in the light most favorable to defendants and challenges on an as-applied basis should await a future day of reckoning. Undeniably, a sharp Sword of Damocles hangs over the officials charged with implementation of this statute. As Governor Cuomo observed, "[o]f course this new school district must take pains to avoid conduct that violates the separation of church and state * * * I believe they will be true to their commitment" (Approval Message of Governor, 1989 NY Legis Ann, at 325).
The concerns about the degree under which this new school district actually operates within the direction and control of *556 elected community leaders who share a particular religious persuasion are issues of applied fact, not law. A similar fact mix is presented as to whether the creation of such a school is rooted solely in the religious preferences of the Satmar or in their cultural, essentially secular, needs and rights, which are entitled to an enlightened and permissible societal accommodation. The needs, at least as emphasized by defendants, stem from the additional emotional impacts on Satmarer handicapped students. Defendants note that if these students  already special  are compelled to leave the Village and attend special education instruction in the Monroe-Woodbury public schools, they are met with a negative and hostile environment in which their language, customs and appearances are regarded as oddities, at best. Justice Levine sagely observed in dissent at the Appellate Division that deeply troubling concerns persist as to whether the courts are able, even in trial, to delve into, trace and ascertain the "true" Satmar theology and precepts (Grumet v Board of Educ., 187 AD2d, at 29, supra [Levine, J., dissenting]; see also, Tribe, American Constitutional Law § 14-11, at 1231 [2d ed]). The bottom procedural line is that this Court has plainly disfavored summary disposition when faced with similarly sensitive and complicated questions of fact (see, Ware v Valley Stream High School Dist., 75 N.Y.2d 114, 131).

VI.
Notably, the record in this case documents sharp contrasts between the manner in which the secular special educational services are provided in the Kiryas Joel public school and the distinctive religious lifestyle of the Village. English is the language of instruction within the school; Yiddish is the medium of communication within the Village. In contrast to the method of instruction at the sectarian schools in the Village, male and female students at the public special education school are grouped together for teaching purposes at the special school; instructional materials are not based upon the sex of the student being taught; female employees are not prohibited from exercising authority over male employees; the physical appearance of the building is secular, including the significant absence of mezuzahs on the doorposts; and the dress of the employees is secular in appearance. The democratically elected Board of Trustees of the Kiryas Joel Village School District has strained to create a nonsectarian educational *557 environment which is faithful to the secular command of the statute. Plainly, this effort is indicative of the secular compromise the Hasidim community was willing to absorb to allow the special education needs of their children to be met within a public, neutral, nondenominational setting.
The judicial nullification of this latest phase of the longstanding tug-of-war prompts the larger question whether control over a public school may ever be placed in the hands of secularly elected individuals who have a common set of religious beliefs. Does a forbidden "symbolic union" always and automatically emerge? The three opinions of the majority suggest so, but I emphatically think not. It is important and fundamental to understand that the establishment of a union free school district geographically identical to an incorporated municipality, in the context of the constitutional and statutory guarantees of public education, neutral religious rights and nondiscrimination provided by both Federal and State law, should not be stigmatized as aid to a particular denomination, simply because the inhabitants of that municipality are predominantly or even exclusively members of that denomination.
For the Court to reject the Legislature's answer with a blunt "No" deprives the citizens of Kiryas Joel of certain educational prerogatives in contravention of their fundamental right to self-governance. Their free exercise of religion is also inextricably implicated and compromised, simply because they have chosen to live and believe in a particular way together in an incorporated village. This dogmatic "No" at the end of a long, difficult odyssey once again strips the special-needs children of their protected public education rights. In effect, their Free Exercise rights are burdened by draping a drastic, new disability over the shoulders of young pupils solely on account of the religious beliefs of their community (see, Church of Lukumi Babalu Aye v Hialeah, 508 US ___, ___, 113 S Ct 2217, 2239-2240, supra [Scalia, J., concurring]; see also, McDaniel v Paty, 435 US 618).
The facile notion that the cultural, psychological and secular differences of the special-needs children of Kiryas Joel cannot be classified as anything but religious in nature should be rejected as alien to our most cherished traditions and values. The cultural disposition and circumstances of handicapped Satmarer children should not disqualify them from government attention on the bare conclusion that their differentness *558 is derived solely from their religious beliefs and, therefore, is constitutionally inseparable from their religiosity. A culturally diverse Nation, which proclaims itself under a banner, E Pluribus Unum, should not tolerate such a self-contradiction, for to penalize and encumber religious uniqueness in this way, in effect, strikes the "E Pluribus" and leaves only the "Unum."
As Justice Levine cogently cautioned in his dissent at the Appellate Division:
"In effect, the majority is saying that the State may not respond to a bona fide secular interest of the Satmarer Hasidim, i.e., the psychological and emotional vulnerabilities of their handicapped children, because the culture bringing about the insecurities of these youngsters was `molded' by Satmar religious precepts. In a real sense, then, the majority is thus holding that merely because of some link between their religion and a legitimate secular need, the Satmarer are disqualified from receiving from the State the purely secular services to meet that secular need" (Grumet v Board of Educ., 187 AD2d, at 29, supra [Levine, J., dissenting]).
Courts have no choice but to enter the struggle to examine the evidence and demarcate between a religious practice and the secular cultural consequences of that practice in a pluralistic society after the Legislature has persevered in doing so. If the courts refuse to do so and insist instead on overturning legislation, such as that at issue here, because it is asserted to be nothing more, on its face, than a forbidden accommodation to the exercise of religious "separatism," then frank confrontation with the values and rights under the Free Exercise Clause becomes unavoidable. Without a doubt, the two clauses  Establishment and Free Exercise  are in some historical and modern natural tension, and the overlap of the clauses may be said to create a "zone of permissible accommodation" (Tribe, American Constitutional Law § 14-7, at 1194 [2d ed]; see also, Ware v Valley Stream High School Dist., 75 N.Y.2d 114, supra). Justice Souter (with Justices Stevens and O'Connor joining) recently reiterated this principle in the concurring opinion in Lee v Weisman (505 US ___, 112 S Ct 2649):
"That government must remain neutral in matters of religion does not foreclose it from ever taking *559 religion into account. The State may `accommodate' the free exercise of religion by relieving people from generally applicable rules that interfere with their religious callings. See, e.g., Corporation of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos, 483 U.S. 327 [1987]; see also, Sherbert v. Verner, 374 U.S. 398 [1963]. Contrary to the views of some, such accommodation does not necessarily signify an official endorsement of religious observance over disbelief" (Lee v Weisman, 505 US, at ___, 112 S Ct, at 2676-2677, supra).
Chapter 748 of the Laws of 1989 could be viewed as a reasonable accommodation of the Satmarer's free exercise of religion because it alleviates, as a last resort, their lack of choice in either having to forego the substantial benefits of publicly supported special educational services for their handicapped children or having to abandon their religious principles. That accommodation in these circumstances, on a facial attack and analysis, is supportable as a permissible deference to the historical and evolved predominance of Free Exercise protection in First Amendment constitutional adjudication.
I would therefore reverse and not declare chapter 748 unconstitutional on its face. The judicial nullification of the democratic prerogatives and solution for this intractable townwide controversy is not justified. Instead, it seems to spring from a reflexive veneration of a symbolic metaphor that sacrifices concededly necessary special education services of a small group of handicapped pupils. A real wall of separation thus arises and solidifies to a mythic height and density.
Order modified, etc.
NOTES
[1] Chapter 748 of the Laws of 1989, provides, in part:

"Section 1. The territory of the village of Kiryas Joel in the town of Monroe, Orange county, on the date when this act shall take effect, shall be and hereby is constituted a separate school district, and shall be known as the Kiryas Joel village school district and shall have and enjoy all the powers and duties of a union free school district under the provisions of the education law.
"§ 2. Such district shall be under the control of a board of education, which shall be composed of from five to nine members elected by the qualified voters of the village of Kiryas Joel, said members to serve for terms not exceeding five years."
[2] See, e.g., Parents' Assn. v Quinones, 803 F.2d 1235 (the Second Circuit preliminarily enjoined implementation of a plan by the New York City Board of Education to provide Federally funded remedial education for handicapped girls from Beth Rachel school by closing off nine classrooms of a public school, and dedicating them to the use of the Hasidic girls); Bollenbach v Board of Educ., 659 F Supp 1450 (the District Court found that the deployment of only male bus drivers to the all-boys United Talmudic Academy had the primary effect of advancing religious beliefs); Board of Educ. v Wieder, 72 N.Y.2d 174, supra (this Court concluded that Education Law § 3602-c neither compels the Board of Education of the Monroe-Woodbury Central School District to nor prohibits the Board from providing private school handicapped children with special services at the private schools or at a neutral site).
[3] Education Law § 3602-c (2) provides, in part: "Boards of education of all school districts of the state shall furnish services to pupils who are residents of this state and who attend nonpublic schools located in such school districts, upon the written request of the parent, guardian or persons legally having custody of any such pupil." Section 3602-c (1) (a) defines "services" as "instruction in the areas of gifted pupils, occupational and vocational education and education for students with handicapping conditions".
[1] The Lemon test has been criticized by many of the Supreme Court Justices in their individual opinions (see, Lamb's Chapel v Center Moriches Union Free School Dist., 508 US ___, ___, 113 S Ct 2141, 2149-2150 [Scalia, J., concurring] [collecting cases]). Indeed, the test was not even invoked by the majority in Zobrest v Catalina Foothills School Dist. (509 US ___, 61 USLW 4641), the Court's most recent Establishment Clause case.
[2] Zobrest v Catalina Foothills School Dist. (508 US ___, 61 USLW 4641) (sign language interpreter for parochial school student); Witters v Washington Dept. of Servs. for Blind (474 US 481) (aid to blind student attending sectarian college); Aguilar v Felton (473 US 402) (public school instructors teaching on premises of parochial schools); Grand Rapids School Dist. v Ball (473 US 373) (similar); New York v Cathedral Academy (434 US 125) (reimbursement for recordkeeping and testing); Wolman v Walter (433 US 229) (textbooks, diagnostic services, remedial education, standardized tests, field trip transportation); Roemer v Maryland Pub. Works Bd. (426 US 736) (grants to private colleges); Meek v Pittenger (421 US 349) (textbooks, instructional materials and various on-site services); Committee for Pub. Educ. v Nyquist (413 US 756) (funds for maintenance and repair, tuition reimbursement and tax benefits to parents); Levitt v Committee for Pub. Educ. (413 US 472) (funds for testing); Hunt v McNair (413 US 734) (revenue bonds for sectarian-affiliated universities); Tilton v Richardson (403 US 672) (Federal construction grants); Lemon v Kurtzman (403 US 602) (teachers' salaries, textbooks, instructional materials); Earley v DiCenso (403 US 602) (salary supplements); Board of Educ. v Allen (392 US 236) (textbooks); Everson v Board of Educ. (330 US 1) (bus transportation).
[3] Lee v Weisman (505 US ___, 112 S Ct 2649) (prayer at graduation ceremony); Edwards v Aguillard (482 US 578) (statute prohibiting teaching of evolution unless accompanied by instruction in theory of "creation science"); Wallace v Jaffree (472 US 38) (period of silence for "meditation or voluntary prayer"); Stone v Graham (449 US 39) (posting of Ten Commandments); Abington School Dist. v Schempp (374 US 203) (prayer and Bible reading at beginning of each school day); Engel v Vitale (370 US 421) (prayer); Epperson v Arkansas (393 US 97) (statute barring instruction in theory of evolution); McCollum v Board of Educ. (333 US 203) (religious instruction by sectarian teachers); see also, Lamb's Chapel v Center Moriches Union Free School Dist. (508 US ___, 113 S Ct 2141) (use of school premises by religious group); Westside Community Bd. of Educ. v Mergens (496 US 226) (same); Widmar v Vincent (454 US 263) (same); Zorach v Clauson (343 US 306) (students released from public school classes for religious instruction).
[4] A "benefit" addressed to one religious group may be related to Free Exercise values, and thus would not be constitutionally objectionable if sufficiently tailored. For example, a State may choose to exempt from criminal drug laws the possession of peyote by those whose religious beliefs mandate sacramental use of that drug (see, Employment Div., Ore. Dept. of Human Resources v Smith, 494 US, at 890). But if the exemption is too broad  permitting, for instance, members of the affected religious group to also possess and traffic in heroin and cocaine, that could, in my view, violate the Establishment Clause.
[5] "The board of education of a union free school district, in addition to having in all respects the superintendence, management, and control of the educational affairs of the district, is given numerous more specific duties and powers. Thus, it is empowered and duty-bound to adopt bylaws and rules for its government as proper in the discharge of its duties; establish rules and regulations concerning the order and discipline of the schools; provide fuel, furniture, apparatus, and other necessaries for the use of the schools; prescribe courses of study; regulate the admission of pupils and their transfer between classes or departments; provide milk, transportation, and medical inspection of schoolchildren; provide home-teaching or special classes for handicapped and delinquent children; provide, maintain, and operate, under prescribed circumstances, cafeteria or restaurant service and other accommodations for teachers and other employees, pupils, and the elderly; and prescribe, and, when authorized, furnish, textbooks to be used in the schools. It is also authorized to purchase property and construct school buildings and facilities thereon; take and hold possession of school property; lease premises, and lease-purchase instructional equipment, for school purposes; sell and exchange school property; insure school property; sue to recover damages, and offer monetary rewards for information leading to the arrest and conviction of persons, for vandalism of such property; provide, where authorized, for lighting, janitorial care, and supervision of highway underpasses; alter former schoolhouses for use as public libraries; and explore, develop, and produce natural gas for district purposes. It is authorized to appoint teachers and librarians and to raise by tax on the property of the district any moneys required to pay the salaries of teachers employed, and also to appoint committees to visit schools and departments under its supervision and report on their condition. Likewise the board is empowered to discharge district debts or other obligations. It has prescribed powers and duties with respect to self-insurance by the district, accident insurance of pupils, insurance against personal injuries incurred by school volunteers, and group insurance and workers' compensation coverage of teachers and other employees, and may, when authorized, withhold from employees' salaries sums to be paid to specified credit unions. Finally, the board possesses all the powers, and is subject to all the duties, of trustees of common school districts, and has all the immunities and privileges enjoyed by the trustees of academies in this state." (94 NY Jur 2d, Schools, Universities, and Colleges, § 99, at 152-157 [1991] [citations omitted].)
[1] That the purpose of chapter 748 was to obviate religious objections of the Satmarers seems plain from any reasonable analysis of the statute's intent from its wording and the statutory scheme. This is borne out by the legislative history and the record. (See, for example, in Bill Jacket to L 1989, ch 748, Mem to Governor Cuomo from Assemblyman Silver urging approval, stating that the bill provides "a mechanism through which [Satmar] students will not have to sacrifice their religious traditions in order to receive the services which are available to handicapped students throughout the State" [emphasis added]; approval mem of Assembly sponsor Joseph Lentol stating that the "[H]asidic jewish community hold[s] firmly to its religious tenets" [emphasis added]; affidavit of Professor Israel Rubin [the author of the book Satmar: An Island in The City quoted in Board of Educ. v Wieder (72 N.Y.2d 174, 180)] to the effect that "[r]eligion and its preservation in the form interpreted and practiced in Satmar, occupies a central place in virtually all matters of importance", that the Satmar schools "are meant to serve primarily as a bastion against undesirable acculturation", that "[b]asically, it is religion which underlies the practice of gender-segregation" and that the "private schools are, of course, among the places where gender segregation is strictly observed"; excerpts from book the Extraordinary Groups by Kephart and Zellner [St Martin's Press 1991]: e.g., "The ethnocentric attitude that they alone are capable of upholding the Torah solidifies the Hasidic belief that all other groups are inferior" and "The goal of the [Satmar] community is social isolation" [id., at 165, 178].)
[2] The Budget Report on the Bill which was later enacted as chapter 748 contains the following: "Based on local wealth data provided by the Monroe-Woodbury school district, and assuming that the 100 special education pupils in the Kiryas Joel school district will be placed in programs qualifying for the high cost component of excess cost aid, we estimate a new Kiryas Joel school district budget of about $1.3 million and new State aid of about $400,000-$450,000. This would leave a local tax bill of about $900,000. Since Monroe-Woodbury attributes about $1.4 million of its tax base to the Village of Kiryas Joel, it appears that the Village's tax payers will benefit from both new State aid and lower, local property taxes as a result of the creation of the new district. Also based on data supplied by Monroe-Woodbury (and current data available from the State Education Department), we estimate that the loss of property and income wealth attributed to the Village of Kiryas Joel will make Monroe-Woodbury poorer to the extent that it will receive operating aid on a formula basis rather than on save-harmless, as it now does. While the increases in State aid to Monroe-Woodbury, due to its then lower wealth, would not occur until the 1991-92 school year, we project such State aid increases would amount to 1.4 million" (Bill Jacket, L 1989, ch 748; emphasis added).